232 P.2d 850

**HEWETT v. INDUSTRIAL COM-
MISSION et al.**

No. 5414.

Supreme Court of Arizona.

June 12, 1951.

Leonard S. Sharman, of Phoenix, for petitioner.

Donald J. Morgan, Phoenix, for respondent Industrial Commission of Arizona.

H. S. McCluskey and Robert E. Yount, Phoenix, of counsel.

LA PRADE, Justice.

This case is before the court on certiorari to review an award of the industrial commission denying death benefits to the applicant-widow for the death of her husband, alleged to have been caused by accident arising out of and in the course of his employment. The deceased employee, while actively engaged in his employment as a gasoline filling-station attendant, was set upon by two robbers, severely kicked in the area of the abdomen and right side, and shot in the left shoulder. These events transpired shortly after midnight on February 3, 1950. The victim was immediately taken to a hospital where he was treated by Dr. G. B. Stewart of Coolidge, Arizona. On February 7th he was released from the hospital, at which time the attending physician was of the opinion that he would need no further treatment and would be able to return to work by February 17th. He reentered the hospital on the evening of February 10th, suffering from intense abdominal pains. He was seen early the next morning by Dr. Stewart, at which time patient was complaining of considerable pain radiating from all around the stomach area "up to—into the heart—and

into his left arm,"—. His pulse was weak and thready, with blood pressure quite low. The doctor ordered that he be given oxygen and was about to direct additional treatment and care when the man suddenly died. In view of the fact that the patient died so quickly and suddenly, the doctor made a tentative diagnosis of coronary thrombosis.

An autopsy was performed by Doctors Maurice Rosenthal and James R. Moore. The autopsy report of Dr. Rosenthal reads in part as follows:

" * * *. There was a diffuse, retroperitoneal hemorrhage found in the abdominal portion. The inferior vena cava was essentially normal but surrounded by blood and blood clot. No thrombi or emboli were found within the lumen of the inferior vena cava. Just at the bifurcation of the aorta a fusiform aneurysm approximately the size of a hen's egg was found and a perforation *measuring 3 cm. in diameter was noted*. The *inner lining* of this aneurysm presented an attached, organizing blood clot. The hemorrhage traveled also along the mesenteric artery and ran upwards and under the diaphragm leaf. The tracheal and tracheobronchial lymph nodes were small and anthracotic in appearance. The tracheal and bronchial mucosa revealed a moderate degree of congestion.

\* \* \* \* \* \*

" * * * At the bifurcation of the aorta, a fusiform aneurysm previously described was noted and the gross appearance was *that of an arteriosclerotic aneurysm with spontaneous rupture*.

\* \* \* \* \* \*

"Conclusions: The immediate cause of death in this subject was due to a rupture of an arteriosclerotic aneurysm at the bifurcation of the aorta with retroperitoneal hemorrhage. *No relationship could be established between the bullet wound in the left shoulder and the immediate cause of death.*

"From the clinical history obtained it appeared that the subject was said to be recovering satisfactorily from the bullet wound sustained several days previously and *no anatomical relationship between this wound and the rupture of the aneurysm of the aorta could be established at the postmortem examination."* (Emp. sup.)

We also quote from the autopsy report of Dr. Moore:

" * * *. On removing the thoracic and abdomen viscera en bloc the hemmorrhage was found to be retroperitoneal and quite extensive. The hemorrhage originated from a rupture of an aneurysm of the abdominal aorta located just above the bifurcation into the iliacs. The walls of the aneurysm showed marked calcified deposits and clots within the lumen. \* \* \*

" * * * Correlating this clinical history with gross findings at postmortem, death was undoubtedly due to the rupture

and hemorrhage of the above described abdominal aneurysm which was of the arteriosclerotic type.

"*From these findings it would appear that death was not caused or hastened by the shoulder wound.*" (Emp. sup.)

At the formal hearing before the commission, and here, the applicant advances the theory that the evidence conclusively discloses that the aneurysm and resulting hemorrhage had been caused or in part induced by excitement, nervous shock, the kicking, and the gun shot wound. To support this theory Dr. Stewart testified as follows:

"Anything that would produce undue tension would have a tendency to contract, make the vessel wall contract. In the process of contracting a thin wall, *you might make the thing rupture.* Trauma would *possibly* rupture or at least might even blow out a little hole and cause a leak in the blood vessel letting the blood escape out into any part of the body where your aneurysm is in.

\* \* \* \* \* \*

"A. *I think it would be far-fetched for me to say that that was the immediate cause of death.* Yet I felt this certainly provoked the symptoms that would be conducive to produce the fatal end of the thing, because the nervous tension, because the extra contraction, the blow in the abdomen *could have caused a small leak.* That is a hypothetical question that *I don't* think that I can definitely say so or not.

\* \* \* \* \* \* .

"A. I think that was one of the main factors. I think that had Mr. Hewitt not sustained the injury *he had he probably would* be alive today and going along and working. I see no reason why he wouldn't have gone along because he *had been doing it.*" (Emp. sup.)

\* \* \* \* \* \*

After giving this testimony he was asked to examine the autopsy findings and conclusions of the autopsy doctors. Having examined these reports the following questions and answers ensued:

"Q. \* \* \*. Now, do you disagree with their findings in that respect?

"A. Well, I base my statement on this fact. That nervous tension, regardless of what it might be from, has a tendency to accentuate or exaggerate any circulatory disturbance. *You might have*—in other words, *supposing* he had the aneurysm before, certainly being kicked in the belly and in the side and shot through the shoulder wouldn't help the condition any *and could be a possible factor,* any traumatic injury, to cause his hemorrhage, or at least, *that would be my opinion.*" (Emp. sup.)

Dr. Stewart further testified that when he first examined deceased the patient did not complain about having been kicked in the stomach but "more in his side and in his ribs up in the left." He admitted that he had examined him for bruises but that

there was no external evidence thereof. The doctor was asked if the rupture of the aneurysm could have been caused by a kick or bruise of which there was no external evidence. His answer to this inquiry was: *"I think it is possible. It is not a usual thing."* (Emp. sup.) Additional questions and answers then followed:

"Q. And do you think it's probable that that was what ruptured the aneurysm, *any blow or kick he might have received, or only possible?*

"A. Well, I'd say *it would be a factor* in the thing. Now as to probability or possibility, the whole injury to me would be probably a little more significant—had he not been shot in the shoulder and merely kicked in the side of his tummy, *it might not have produced* it but the *accumulation* of all of it together, I think, *was a factor* in his—*probably* in the ruptured aneurysm.

\* \* \* \* \* \*

"Q. In your opinion, this aneurysm which was ruptured was caused by the injuries he received on February 3rd in view of *the fact he appeared to be normal and working and in good health immediately prior to that, is that correct?*

"A. *That would be a factor in it.* Whether or not it could be the sole cause, I don't think I can say or anybody else could." (Emp. sup.)

The doctor said that the blows might have caused a small leak, and then "I don't think it caused the big leak. This rent appeared too long afterwards. *It could have caused a small leak and that,* in turn, by necrosis of the tissue, could have weakened the wall of the vessel." (Emp. sup.)

"A: \* \* \*. That hemorrhage around that small rent could have so weakened the tissue that the wound could have healed over and apparently recovered from his gunshot wound but his activity at home, any movement he might have had might have caused a sudden new aneurysm. *The original thing could have been a small rent from his injury.* That's the thing I can't say." (Emp. sup.)

After the hearing before the commission, all of the testimony of Dr. Stewart was submitted to the autopsy surgeons. Dr. Rosenthal reported back to the commission as follows:

"The new evidence submitt(ed) concerning this case has been considered. However, in view of the fact of the time elapsed following the gunshot wound and the sudden onset of the abdominal symptoms, it would appear that no definite causal relationship could be established between the trauma sustained of the left shoulder and the sudden rupture of the arteriosclerotic aortic aneurism."

Dr. Moore's response was:

"This file, including the transcript of the recent hearing, has been reviewed. The principle new evidence submitted would appear to consist of increased emphasis

placed upon testimony that the patient was kicked in the side and abdomen and upon the complaints made with reference to the side and abdomen.

"If the patient was so knocked down and kicked in the side and abdomen, there are no reported clinical findings or subsequent pathology findings which would indicate that the aneurysm of the abdominal aorta was affected by such acts. Had the rupture of the aneurysm and death of the patient occurred within the same space of time following the gunshot as actually did occur following the onset of the acute and fatal attack of 2–10–50, a conclusion that such was precipitated by trauma would be justified.

"In view of the fact, however, that there was an eight day lapse between the accident and the onset of the acute symptoms of the ruptured aneurysm and death, it would appear that such a conclusion would not be justified."

■ The cause of death of a human being, when not patently discernible by a layman, must be left exclusively to medical experts. In the instant case Dr. Stewart, before the autopsy, did not know the cause of death since it was not discernible from an exterior examination of the body. The cause of death could only be, and was, demonstrated by the autopsy findings. When confronted with the autopsy findings, Dr. Stewart says that the kicks in the abdomen "could have produced" a small rent in the aneurysm and that the excitement attend-

ing the shooting undoubtedly produced undue tension which "might make the thing rupture"—"could have caused a small leak" and that the kicking "could have been a factor".

It was the opinion of the autopsy surgeons that the rupture and fatal hemorrhage was an immediate thing and had it been traumatically induced it would have immediately caused a gross hemorrhage from which the man would have died in a very short time. In any event, the official determination of cause of death had to be found by a lay body which of necessity had to rely upon the opinions of experts. Under these circumstances we believe that the principles announced in the case of Ison v. Western Vegetable Distributors, 48 Ariz. 104, 59 P.2d 649, 653, are clearly applicable and determinative of a correct disposition of the instant case. In the Ison case the applicant-employee suffered a blow on the chest on April 9th; was admitted to the hospital on April 28th, at which time it was discovered that he was suffering from a lung abscess. One doctor was of the opinion that the abscess had been induced by the blow. Another expert ascribed the abscess to a pneumonia condition. He was of the opinion that pneumonia, following a severe contusion to the chest, is possible but quite rare and in any event would supervene within three or four days. With these contrary opinions before the commission, it concluded that the illness had been occasioned by the

pneumonia rather than the blow. On review this court observed that it is fixed law in this jurisdiction that the petitioner must establish his case by preponderance of the evidence. The court then defined 'preponderance of the evidence' in this situation as follows:

 "* * *. Preponderance of the evidence means such evidence as when weighed with that opposed to it has more convincing force, and from which it results that a greater probability is in favor of the party upon whom the burden rests. It does not necessarily depend upon the number of witnesses; it merely means that the testimony which points to one conclusion appears to the trier of facts to be more credible than the testimony which points to the opposite one. *The capacity of the submitted testimony to enforce belief on the arbiter to whom it is submitted is the touchstone of preponderance as applied to the testimony of witnesses.* With this rule for our guidance, can we say affirmatively that the preponderance of the evidence as to the causal connection between the accident and the bronchial abscess is, as a matter of law, with the petitioner? Obviously, when two equally honest and experienced expert witnesses reach opposite conclusions, the only thing the trier of fact can do is to decide which one of these witnesses is more probably correct in his conclusion. In so doing, he may take into consideration the experience of the witnesses in diagnoses of ailments of the kind under consideration, and their interest or bias, conscious or unconscious, in the result to be reached. Applying these rules, *we think it is clear to any fairminded layman that it cannot be said affirmatively that, as a matter of law, it was the duty of the commission to accept the opinion of one medical witness over that of the other.* (Emp. sup.) Such being the case, we are bound by the conclusion which it has reached as to which witness was more probably correct. It is urged that the testimony of one physician is positive that the injury caused the abscess, while the other merely states that it was extremely probable that it did not, and that the commission should, therefore, have accepted the positive testimony over that which was merely conjecture. There might be some merit in this contention if the point at issue was one which was subject to positive knowledge, such as the presence or absence of a certain person, a collision between two automobiles, or other similar matters; but the question is necessarily one of opinion and not of knowledge, and, when this is so, the fact that one opinion is expressed more positively than the other, does not, as a matter of law, require that a trier of fact give it more weight. We are compelled to hold, therefore, that the conclusion of the commission that it does not appear affirmatively that there was any causal connection between the accident of April 9th and the disability from which petitioner admittedly suffered must be upheld."

██ Where the determination of the cause of death must rest on expert medical testimony, the opinion of the experts based upon supporting facts and logical theories furnishes reasonable evidence to support an award found by the triers of the facts. Tashner v. Industrial Commission, 62 Ariz. 333, 157 P.2d 608; and Lewis v. Industrial Commission, 65 Ariz. 31, 173 P.2d 639. Since there is a conflict in the evidence of the medical experts as to the causal relationship between the injuries sustained by deceased and his death some ten days later, this court is bound by the findings of the commission relating thereto and can only affirm the award. It is so ordered.

UDALL, C. J., and PHELPS and DE CONCINI, JJ., concur.

STANFORD, Justice (dissenting).

The testimony of Dr. G. B. Stewart, who is one of the leading surgeons of Pinal County, was not, in the majority opinion, quoted as to its most important part, and I quote therefrom:

"Q. That's what I wanted to find out. In other words, in your opinion, if he hadn't undergone these injuries and so forth he did on that night, you feel he would have every reason to be alive and working today?

"A. That is my honest opinion. I think that is true."

As will be noted from the majority opinion, Dr. Rosenthal never said that there was no relationship between the severe kicking in the side and stomach and the resulting death. I quote from the autopsy report to the commission: "From the clinical history obtained it appeared that the subject was said to be recovering satisfactorily from the bullet wound sustained several days previously and no anatomical relationship between this wound and the rupture of the aneurysm of the aorta could be established at the postmortem examination."

Again Dr. Rosenthal, in his report to the Industrial Commission, and as quoted in the majority opinion, said: "The new evidence submitt(ed) concerning this case has been considered. However, in view of the fact of the time elapsed following the gunshot wound and the sudden onset of the abdominal symptoms, it would appear that no definite causal relationship could be established between the trauma sustained of the left shoulder and the sudden rupture of the arteriosclerotic aortic aneurism."

Clearly, what Dr. Rosenthal had in mind was the shooting through the left shoulder and not the kicking in the body and stomach, that bore no relationship to the death of Hewett.

Mrs. Alice L. Hewett, wife of deceased, testified in the case and said, in telling what her husband told her when he was first hurt:

"Q. Did he tell you where they had kicked him?

"A. Yes, he complained that his left side, and stomach hurt him all the time.

"Q. And is that the same area he complained of hurting when you returned him to the hospital February 10th?

"A. Yes, sir."

James V. Eaves, deputy sheriff, testified that on the morning of the robbery, Hewett related to him some of the incidents as follows: "* * * And he said that he shot back and missed and the negro with the gun, taking the gun away from him, knocked him down, then kicked him in the side, made him get up to take the money out of the cash register. * * *."

A. N. Luper, who with E. S. Schupp, drove to the station to get gas, and were also robbed, testified that after Hewett had been taken to the deputy sheriff's office and returned to the station temporarily:

"Q. What portions of his body, from your observations at the time, appeared to be bothering him?

"A. Most of the time while we were talking there he had—he was holding his stomach. He had both hands like this (indicating) and he was sort of in a crouch."

Evidence of the fact that Hewett was kicked in the abdominal region as well as the side is many times corroborated and is no where contradicted. The testimony concerning this matter also indicated that he suffered considerably from such blows.

The only medical evidence which could be interpreted to indicate that the death was *not* brought about or hastened by the effects of *all* of the injuries sustained, is Dr. Moore's final report, quoted in the majority opinion. In submitting this report, Dr. Moore apparently entertained some doubt as to whether Hewett actually had received the blows to the abdomen and side, and this report on the whole shows a somewhat vague concept of the evidence of circumstances surrounding the death brought out at the hearing. At no time does he make an unequivocal statement that the combined effects of the injuries on Hewett's physical condition in no manner hastened or contributed to the death, as contrasted with Dr. Stewart's testimony above quoted and also the following: "Well, the nervous system, blood vessels, the size of them, the caliber is governed by the nervous system. Any thing that would produce undue tension would have a tendency to contract, make the vessel wall contract. In the process of contracting a thin wall, you might make the thing rupture. * * *"

And again: " * * * That nervous tension, regardless of what it might be from, has a tendency to accentuate or exaggerate any circulatory disturbance."

It must be noted that there is no conflict in the medical evidence as to the immediate cause of death, the rupture of

the aneurysm, and the over-all picture presented by the reports of Drs. Moore and Rosenthal, is, as pointed out in the majority opinion, to the effect that the rupture was not *traumatically induced*. With this Dr. Stewart does not find fault, but while Drs. Moore and Rosenthal fail to express any opinion as to the cause of the rupture, Dr. Stewart's opinion was that it was induced by the disturbances of the nervous and circulatory system which resulted from the combined effects of all the injuries sustained.

As Dr. Moore's last report contains the only medical opinion upon which the award could have been based, which even approaches the inclusion of *all* of the factors involved in the injury and death, the commission of necessity must have based its conclusion on this one report. Even if the material in this report could without reserve be interpreted so as to support the conclusions of the commission, this I think would be highly illogical and unjustified. In our case of Tachner v. Industrial Commission, cited in the majority opinion, this court said: " * * * The commission should, and must, give due weight and consideration to the opinion of the medical board, but it is not bound by its conclusions, particularly where the conclusions are wholly unsupported by the actual facts, or, as here, contrary to the medical history and findings. It is the medical findings rather than the conclusion which constitute evidence. Obviously, the conclusion or opinion which is counter to the actual facts or findings, and which on the face of the record is illogical and without support, cannot be treated as reasonable evidence." [62 Ariz. 333, 157 P.2d 610.]

It seems to be accepted by all the medical experts herein that the aneurysm was a condition existing prior to the shooting, and from Hunter v. Wm. Peper Const. Co., 46 Ariz. 465, 52 P.2d 472, 474, I quote: " * * * It is of course true, under our decisions, that if some form of physical injury aggravates any already existing physical disease or condition, the injured workman is entitled to compensation to the extent of the disability caused thereby in the same manner as though his condition had been produced originally and directly by the injury. (Citing cases.)"

The majority opinion is unjust and unfortunately leaves a widow who, by the record, is entitled to relief, without a thing. I think the conclusion reached by the commission is unreasonable, illogical and unjustified in light of *all* of the medical history, findings and conclusions, and the award should be set aside.