272 P.2d 601

JENKINS

v.

INDUSTRIAL COMMISSION et al.

No. 5872.

Supreme Court of Arizona.

July 12, 1954.

378

Ashby I. Lohse, Tucson, for petitioner.

Robert E. Yount, Phoenix (John R. Franks, Donald J. Morgan and Robert K. Park, Phoenix, of counsel), for respondent, Industrial Commission.

PHELPS, Chief Justice.

On May 9, 1951, petitioner was employed by Firestone Tire & Rubber Company in Tucson. While handling an automobile battery on that date it exploded causing petitioner to suddenly jerk his head back from the explosion. He threw his hands up pressing them against his glasses, bending the frames. Some acid was thrown in his face but no injury was caused thereby. No solid particles struck him. There were no immediate symptoms as a result of the accident. Two weeks later petitioner noticed flashes or streaks of light in the left half of the visual field of the right eye along with a film or veil over that eye.

About a week later petitioner called upon Dr. Bernfeld who, after an examination, placed him in the hospital and operated upon the eye for the purpose of attempting to correct a separation of the retina. The operation was unsuccessful. He completely lost his vision in the right eye. He applied to the Industrial Commission of Arizona for compensation and was later awarded compensation therefor. This award became final and is not now in question. The employer was carrying Workmen's Compensation Insurance with the state compensation fund.

During the early part of July, 1951, while petitioner was confined in bed at home under the instructions of Dr. Bernfeld preparatory for a cataract operation upon the left eye, he began to see flashes of light in the left eye of the same character as he had experienced in the right eye. These flashes of light continued to appear in front of the left eye after the operation. On September 6, 1951, petitioner called upon Drs. Irvine, Irvine and Irvine, eye specialists in Los Angeles and was examined by each of them. Dr. A. Ray Irvine, Jr., wrote a letter to the commission on October 10, 1951, concerning this examination in which he stated:

"A cataract operation was performed on the left eye in July, 1950. Recently the patient has been bothered by increase in 'floaters' and flashes of light, and he fears possible detachment of the retina in this eye.

"Examination of this left eye shows vision correctively to 20/30 with + 8.50 —2.00 x 20, and he is able to read 4 point type with a + 3.00 add. The eye is white and quiet. There is no evidence of inflammation in the anterior chamber. An operative coloboma of the iris is present. The pupillary edge is adhered to lens remnants preventing dilation of the pupil. There is a central hole in the pupillary membrane, through which vitreous is streaming into the anterior chamber. Ophthalmoscopically, the nerve appears normal. There is a layer of vitreous dust overlying the macula. There are many vitreous floaters, all of which give a slight haze to the retinal picture. The periphery above seemed normal, there being no evidence of detachment. The lower periphery of the fundus was invisible because of the contracted pupil, but I could study the fundus as far out as the equator and found no evidence of detachment. A copy of the visual fields are included.

"Impression: The right eye is hopelessly blind. I do not believe there is detachment in the left eye, but the patient should be observed at regular intervals and fields taken to help diagnose beginning detachment as visualization of the fundus is limited. In the event of detachment in the lower field I would not hisitate to cut the spincter of the iris at 6 o'clock to facilitate observation of the fundus prior to attempting surgery for correction of the detachment. I believe a detachment may well occur within the next ten years, and in such an event the prognosis for vision is poor."

\* \* \* \* \* \*

" 'History: The patient, a 51 year old white mechanic, has been near sighed for as long as he can remember. An extra capsular cataract extraction was performed upon the right eye five years ago. Post operatively he experienced irritation, redness and pain for some time suggesting that vitreous may have been lost. On May 9th, 1951, while at work a battery exploded with sufficient force to bend his glasses against his brow. Two days later he noticed a veil over the right eye, and on June 4th a "curtain" appeared in his visual field extending obliquely from 1 to 4 o'clock. A week later a retinal reattachment operation was performed by Dr. Bernfeld. There was no improvement in his visual field postoperatively. An extra capsular extraction was performed on the left eye July 9th, 1950 (should be 1951).

" 'Mr. Jenkins was concerned about the presence of light flashes in the upper field. He also complained of a constant field defect above in the left eye since his cataract extraction."

\* \* \* \* \* \*

" '\* \* \* The corrected vision in the left eye was 20/30. He was able to

read Well's 4 point type. The tension was normal. Capsular remnants were seen behind each iris pillar. The tip of each iris pillar was adherent to the vitreous face. There were heavey vitreous strands with some extension into the anterior chamber, but I was (not) able to see any adhesion to the cornea in the left eye. Although fine and coarse vitreous opacities obscured the posterior segment somewhat, I was unable to note any evidence of retinal detachment. Enclosed is a copy of the perimetric field. It coincides with the configuration of the capsular remnants in the pupil inferiorly, and is, I believe, explained by them.

" 'The patient returned to see Dr. Rodman Irvine and Dr. Wendell Irvine. The former elicited a history of light flashes in the upper field of the left eye. Dr. Wendell Irvine also noted a peripheral area of degeneration from 5 to 7 o'clock. I felt that there was a dense vitreous veil from 3 to 4 o'clock and some greyish white plaques at the retina in the two meridian in the mid periphery. Dr. Rodman Irvine took a field on the tangent screen and is sending you a report of his findings and recommendations. As far as I am concerned, the right eye is beyond repair. I do not see any evidence of retinal detachment in the left eye but feel that the patient should be observed closely for the onset of such a catastrophe.' "

Later, to wit, on June 29, 1953, the deposition of Dr. A. Ray Irvine, Jr., was taken under oath in which he stated insofar as here material: "Symptoms of patient (on September 6, 1951) were suggestive of but not pathognomonic (apparently meaning not decisive) of retinal separation." He also stated that symptoms reported by petitioner to him of limitations of his field of vision at that time were indicative of beginning of a detachment of the retina; that although he then found no evidence of detachment that did not mean that detachment had not begun and that a detachment might occur at any time; that on January 8, 1952, he again examined petitioner and found vision in the left eye reduced to light perception and stated that it was probably caused by the explosion.

According to petitioner's testimony under oath at a hearing held before the commission September 10, 1953, within a few days after petitioner returned from Los Angeles to Phoenix in September, 1951, his vision was reduced to the point that he had to be led in order to go from place to place, that his only vision was to distinguish between daytime and night. Dr. Stuart Sanger who gave petitioner cortisone at the suggestion of Dr. Bernfeld beginning October 1, 1951, estimated petitioner's percentage of loss of vision in the left eye at that time at 75 per cent.

Drs. Bernfeld and O'Connor of Tucson and Dr. A. Ray Irvine, Jr., of Los Angeles, eye specialists, all were of the opinion that

the retinal detachment of petitioner's left eye was contributed to by the accident of May 9, 1951. Drs. Toland, French and Melton of Phoenix, also eye specialists, were especially appointed by the commission to give their opinion, based upon the record in the case, as to the cause of the detachment to petitioner's left eye "in relation to the indirect injury of May 9, 1951."

On July 14, 1952, they made their report to the commission in which they said:

"The files state that Mr. Jenkins (1) was a high myope, (2) had bilateral cataract extractions, (3) had bilateral capsulotomies, and (4) had peripheral retinal degeneration of the left eye between 5 and 7 o'clock with many vitreous floaters, as indicated in Dr. Irvine's report of September 6, 1951 which was 4 months after the injury, and at which time no evidence of detachment was found.

"We, the undersigned, feel that (1) the above findings are more contributing causes of a detachment than was the indirect injury, and (2) since no evidence of detachment was found 4 months after the injury that the resultant detachment 2 months later, or 6 months after the injury, was due to pathological disorganization of the retina rather than to trauma. We feel that the Commission was very generous and liberal in accepting the detachment of the right eye as compensable as all these types of cases present an element of doubt. We are of the opinion that the detachment of the left eye is not related to his injury whatsoever."

On August 14, 1952, the commission entered its award allowing compensation for petitioner's loss of his right eye but denied compensation for the loss of the left eye giving as its reason therefor that a reviewing board of eye specialists after examining the files in the case found that "we are of the opinion that the detachment of the left eye is not related to his injury whatsoever." Thereafter a motion for rehearing was granted and hearing held in Tucson on September 10, 1953, at which time Drs. Klein and O'Connor, and petitioner, testified. The pertinent portions of this testimony will be hereinafter stated in substance. Later, on October 9, 1953, Dr. Virgil A. Toland testified at a hearing held in Phoenix. The deposition of Dr. A. Ray Irvine, Jr., of Los Angeles as above stated, was filed with the commission on July 1, 1953.

On November 30, 1953, the commission entered its findings and award affirming its award of August 14, 1952, denying petitioner compensation for the loss of his left eye.

This latter award is based upon the specific finding that "claimant has not shown by his evidence or witnesses that the loss of claimant's left eye was the result of, *or in any wise contributed to by any accident claimant suffered in his employment.*" (Emphasis supplied.) The above finding is

assigned as error upon the ground that there is no evidence to support it.

A determination of this question requires an examination of the evidence. Drs. Bernfeld and O'Connor of Tucson and Dr. A. Ray Irvine, Jr., of Los Angeles, all of whom are eminent eye specialists, made personal examinations of petitioner's left eye in particular and the record discloses that each and every one of them declared it to be his opinion that the indirect injury sustained by petitioner on May 9, 1951, as a result of the explosion of an automobile battery then being handled by him, contributed to the retinal detachment of the left eye. Drs. Rodman Irvine and Wendell C. Irvine were not called upon to testify concerning the matter.

Drs. Toland, French and Melton of Phoenix, upon whose statement the commission relies, stated in substance the same thing in their report to the commission bearing date July 14, 1952. After stating their findings from the files in the case to the effect that petitioner "(1) was a high myope, (2) had bilateral cataract extraction, (3) had bilateral capsulotomies, and (4) had peripheral retinal degeneration of the left eye between 5 and 7 o'clock with many vitreous 'floaters', * * *" they then stated as their opinion in part as follows:

"We, the undersigned, feel that (1) the above findings *are more contributing causes of a detachment than was*

*the indirect injury, * * *"* (Emphasis supplied.)

This language is susceptible of no other interpretation than that these gentlemen recognized the "indirect injury" as a contributing cause of the detachment but by comparison stated that the findings upon which they based their opinion *contributed more* to the detachment than the "indirect injury" sustained by petitioner as a result of the battery explosion. The concluding sentence in the opinion that "We are of the opinion that the detachment of the left eye is not related to his injury whatsoever." is in direct and irreconcilable conflict with the statement above quoted that the injury did contribute to the detachment. This contradiction divests the opinion of any probative value whatever. The injury either contributed to the detachment or it did not. If it did, the injury has a causal connection with the detachment and is compensable. If it did not it is neither causal nor compensable. In addition to the above, the opinion of Drs. Toland, French and Melton of July 14, 1952, is not based upon all of the records and files in the case at the date of the final award in that the deposition of Dr. A. Ray Irvine, Jr., *was not* taken until June 29, 1953. This necessarily divests it of the character of substantial evidence.

Drs. Irvine, Bernfeld and O'Connor all considered the factors found by Drs. Toland, French and Melton and stated that these things all contributed to the detachment. Dr. O'Connor testified in substance

that because of the existence of these weaknesses in the eye, the sudden jerk of the head under the circumstances caused the detachment process to begin.

On October 9, 1953, Dr. Toland testified under oath before the commission and stated that since he and Drs. Melton and French gave the commission their opinion on July 14, 1952, he had *reviewed* Dr. O'Connor's testimony and had *seen* Dr. Irvine's deposition and based upon his original review and the subsequent review of testimony including the deposition of Dr. A. Ray Irvine, Jr., he found nothing in the latter deposition that caused him to change his mind.

He testified that flashes of light before the eye is a premonition that a detachment may be starting to occur. He said the basis of his opinion that there was no relation between the injury and the detachment was that petitioner's eye was predisposed towards a detachment. As above stated, Drs. Bernfeld, O'Connor and Irvine stated that the factors found by Dr. Toland to exist did predispose petitioner's eye to detachment. But that the injury of May 9, 1951, was also a contributing cause of the detachment. Dr. Toland further stated that light flashes early in July, if they occurred following the accident in May could be an indication of detachment. He said he also based his opinion that no causal relation existed between the injury of May 9 and the subsequent retinal detachment in part upon the fact that detachment did not take place for a period of eight months, to wit, in January, 1952. He was then asked:

"Q. And if the light flashes appeared in the early part of July in the left eye, would that be a factor that you did not have at the time you made your report as of July 14th? A. No, I can't say that.

"Q. The flashes are immaterial? A. Yes.

* * * * * *

"Q. Do the symptoms of light flashes appear prior to the (cataract) operations or subsequent, Doctor, generally? A. Well, as a rule—First, let me make this statement about light flashes. * * * If a patient walks in our office complaining of flashes of light, we look for hemorrhage, for infection, or for an impending detachment. Those are the three things which are important to us. * * *"

The statement of Dr. A. Ray Irvine, Jr., in his letter to the commission of October 10, 1951, was to the effect that his examination of the left eye on September 6 showed no evidence of inflammation in the anterior chamber which we interpret to mean that there was not present in the left eye at that time either hemorrhage or infection. If that is not the meaning of the language employed by Dr. Irvine it is reasonable to assume that if there had been hemorrhage or infection in the eye, he would have

·shown it in reporting the result of his examination. Therefore, according to Dr. Toland's diagnostic processes, these two conditions having been eliminated, there was no other existing cause for the light flashes except impending detachment. True, Dr. Toland stated in other parts of his testimony that there were other things which would cause light flashes but the Doctor doesn't look for them in his practice in diagnosing a case of this kind.

Another ground stated for Dr. Toland's conclusion as testified to by him was that Dr. Irvine stated in his letter of October 10, 1951, that he found no evidence of detachment in the left eye as a result of his examination of September 6. However, Dr. Irvine did state in that letter that the lower periphery of the fundus was invisible because of the contracted pupil (in the left eye) but he could study the fundus as far out as the equator. Dr. O'Connor, in referring to Dr. Irvine's report of this matter testified before the commission that this did not negate the possibility that there could be a flat detachment inferiorly because due to the contraction of the pupil the portion of the retina could not be examined.

Dr. Irvine found in his examination of petitioner's left eye September 6 that there was a loss of upper temporal field in that eye. This was determined by a visual field taken by him. Dr. O'Connor testified that this could be due to the flat detachment of the retina inferiorly in an area that could not be examined because of the contracted pupil following the cataract surgery.

That portion of Dr. Toland's opinion as evidenced by his testimony under oath on October 9, 1953, to the effect that there is no causal connection between the injury sustained on May 9, 1951, by petitioner and the subsequent detachment of the retina contradicts itself in that on at least two occasions he testified that light flashes were important and premonitioned a detachment; and in answer to a question only a few seconds later he stated that light flashes were immaterial.

Furthermore he based his opinion on assumed facts instead of on the facts shown by the record and files. He stated in his testimony:

"* * * It is my opinion that if the patient was injured at the time of the accident, symptoms would appear shortly afterward and would not wait until a period of, as I have previously said, eight months. But now you say they occurred even four, five or six months—as you notice in the right eye it occurred within two or three weeks."

On this point the letter of Dr. Irvine to the commission bearing date October 10, 1951, stated that on the previous September 6 Mr. Jenkins was concerned about light flashes in the upper field of the left eye and that he also complained of a constant field defect in the left eye since the cataract extraction. And in Dr. A. Ray

Irvine, Jr.'s deposition taken June 29, 1953, he made the following answers to the following questions:

"Q. No. 7: Did Mr. Jenkins report to you light flashes in his left eye at that time? A. Yes.

"Q. No. 8: If the answer to number 7 is "yes", at what time did he report the first appearance of light flashes? A. Since cataract extraction on July 1950 (the evidence conclusively shows and it is stipulated by all parties that this operation occurred early in July, 1951).

"Q. No. 9: At the time of your first examination of the left eye did you observe any evidence of the detachment of the retina? A. Symptoms of patient were suggestive of but not pathognomonic of retinal separation (in Webster's New International Dictionary, 2d Ed., "pathognomonic" is defined medically as "specially, distinctively or decisively characteristic of a (certain) disease.)"

In other words Dr. Irvine stated the symptoms observed were suggestive but not decisive of retinal separation.

"Q. No. 10: At the time of your first examination of Mr. Jenkins did he report limitations in his field of vision? A. Yes.

"Q. No. 11: If the answers to questions 7, 8 and 10 are yes, are the symptoms reported indication to any extent of the beginning of a detachment of the retina? A. Yes.

"Q. No. 12: If, at the time of your first examination (September 6, 1951) you could not determine any evidence of detachment, does that mean the detachment had not started or does it mean that from the symptoms given you by Mr. Jenkins it had started but was not yet visible? A. The latter is correct."

Despite the above statement of Dr. Irvine, Dr. Toland stated that after reading the above statements of Dr. Irvine "I am sure he did not feel there was a detachment at that time." He later repeated the same assertion and said he did so regardless of Dr. Irvine's deposition which he had read.

After reading from the deposition to Dr. Toland Question No. 12 and Dr. Irvine's answer thereto, Dr. Toland was asked if he believed that Dr. Irvine was wrong. He answered:

"No, I do not believe—what Dr. Irvine is telling you is that he did not find enough evidence of a detachment to pursue any course for treating the detachment. If he was suspicious enough of detachment, he would have taken more positive steps at that time than he did."

It will be seen from the above testimony that Dr. Toland persistently refused to accept these facts as a basis for his opinion. The opinion therefore has no validity and

can furnish no basis upon which the Industrial Commission could possibly predicate a finding and award.

■ In view of the evidence to which reference is made above we hold that the finding of the commission that the petitioner had not shown by his evidence or witnesses that the loss of his left eye was the result of or in any wise contributed to by any accident suffered by him in his employment is clearly erroneous and not supported by any substantial evidence. As shown above, every doctor who testified has given an opinion in this case including Drs. Toland, French and Melton that the injury of May 9, 1951, contributed to the detachment of petitioner's left eye.

■ We have held that findings of fact by the trial court should not be disturbed on appeal when the evidence is conflicting and the credibility of the witnesses is involved unless it appears that the findings are clearly erroneous. We said in Todaro v. Gardner, 72 Ariz. 87, 231 P.2d 435, 438, that:

"* * * 'where from the evidence it is clear that reasonable men can come to but one conclusion, we have never hesitated to set aside a jury's finding contrary to such conclusion. In this case we hold there is no evidence to support a verdict of negligence. * * *'" Citing Owl Drug Store v. Crandall, 52 Ariz. 322, 80 P.2d 952, 954, 120 A.L.R. 1521.

The same rule applies to findings of the Industrial Commission.

We unhesitatingly hold that there is no substantial evidence to support the crucial finding of the commission and that such finding is clearly erroneous.

For the reasons stated above, the award is set aside.

STANFORD, UDALL and WINDES, JJ., concur.

LA PRADE, Justice (dissenting).

I cannot agree with the disposition of this case made by the majority. In my opinion the medical evidence merely creates a conflict, and where this situation exists it is the duty of this court to support the award of the Commission unless it is to set itself up as the triers of the fact. Ison v. Western Vegetable Distributors, 48 Ariz. 104, 59 P.2d 649; Hewett v. Industrial Commission, 72 Ariz. 203, 232 P.2d 850; Davidson v. Industrial Commission, 72 Ariz. 314, 235 P.2d 1007.

It has heretofore been the rule, and should be now, that findings of the Industrial Commission are to be given the same consideration as those of a jury or trial judge, and where there is reasonable evidence to support the award or reasonable men might draw either of two inferences from the facts, the Commission's findings must be sustained. West Chandler Farms

Co. v. Industrial Commission, 64 Ariz. 383, 173 P.2d 84; Blasdell v. Industrial Commission, 65 Ariz. 373, 181 P.2d 620.

The Commission is the fact-finding body. As far as I can glean from the record and all the testimony after meticulously examining it, I cannot find where any of the doctors testified positively that the detachment of the retina was caused by the so-called trauma—jerking of the head. All of the doctors related many predisposing causes that *could have caused* the detachment.

The accident happened on May 9, 1951, and during the latter part of June or the first week in July the petitioner experienced light flashes. On July 9, 1951, a cataract operation was performed on the eye. On September 6th he was examined by the Drs. Irvine in Los Angeles. In Dr. Irvine's report he stated that the patient reported light flashes after the cataract operation. The full report of the Drs. Irvine is quoted in the majority opinion. These doctors, after being acquainted with the condition of the eye as they found it and reported it to be, stated that they did not see any evidence of retinal detachment. This was four months after the so-called trauma. These doctors examined the patient the following January, eight months after the so-called trauma, and at that time discovered that there was a complete detachment.

Drs. Toland, Melton and French were of the opinion that if the patient had suffered a tear from the trauma that in the normal course of events the detachment would have appeared much sooner. Dr. Toland was of the opinion that the lapse of eight months was a very material fact in arriving at his opinion. Dr. O'Connor testified that the length of time before the separation was found was to him unimportant though he recognized that Drs. Toland, French and Melton attached great importance to the lapse of time. He recognized that as medical practitioners (eye specialists) they were entitled to their opinion. I am sure that he never entertained the idea that their opinion was worthless. Drs. Toland, French and Melton, to whom the case had been referred to sit as a consulting board, and relying on the entire record and the facts as found by the Drs. Irvine, reached this conclusion:

"We are of the opinion that the detachment of the left eye is not related to his injury whatsoever."

They were of the opinion that the detachment "was due to pathological disorganization of the retina rather than to trauma." The pathological disorganization they found to be disclosed in the report of Drs. Irvine. This report discloses that Mr. Jenkins (1) was a high myope and (2) had peripheral retinal degeneration of the left eye between 5 and 7 o'clock with many vitreous floaters. I take the report to mean that if any reasons are to be assigned for the detachment it was to be found in the pathological conditions of the eye, one of which was an intervening cataract operation. They state that these conditions contributed more to

the detachment than did the indirect injury, though not pretending positively to know what caused it. But they then said that they were of the opinion that the indirect injury had nothing to do with it. Still the majority say that because they referred to these conditions as more contributing causes that they thereby recognized that the indirect injury was a contributing cause. The majority find in this report a negative pregnant. To me this interpretation of the report of Drs. Toland, Melton and French is wholly unreasonable and in nowise justified. These doctors stated that *"we are of the opinion that the detachment of the left eye is not related to his injury whatsoever."* The majority pay no attention to this opinion and brand it as valueless. They read a sentence or two to the effect that other conditions were more contributing to be equivalent to stating that the trauma contributed to the retinal detachment. The majority say that Drs. Bernfeld, O'Connor and Ray Irvine, Jr. *"declared it to be his opinion that the indirect injury sustained by petitioner* on May 9, 1951, as a result of the explosion of an automobile battery then being handled by him, *contributed to the retinal detachment of the left eye."* Then they say that Drs. Toland, French and Melton, of Phoenix, on whose statement the Commission relies, stated in substance the same thing. I do not understand how language can so be distorted. In any event the language of the report speaks for itself.

What did Drs. Bernfeld, O'Connor and Ray Irvine, Jr. say? Did they *declare* it to be *their opinion* that the indirect injury sustained by the petitioner contributed to the original detachment of the eye? Rather than to paraphrase what these doctors said I prefer to quote.

### Dr. Bernfeld

*"It is entirely possible* that at the time of Mr. Jenkin's injury, which was a contre coup type to his head, *the retina of the left eye was also disturbed* sufficiently to start a detachment which did not become entirely evident until a later date." (Ind. Comm. Rec. #19-B) (Emphasis supplied.)

### Dr. Michael J. O'Connor

"The history of the injury to Mr. Jenkins and his several eye operations is well known to you. *It is possible that the injury that he sustained played a definite part in the subsequent production of the separated retina in the left eye, however it cannot be stated with certainty because of the frequency with which* separated retinas occur spontaneously, without history of injury, in myopic individuals who have had cataract operations." (Ind. Comm. Rec. #20) (Emphasis supplied.)

### Dr. A. Ray Irvine, Jr.

The following question in part was put to the doctor:

"Q. * * * Would you say the detachment of the left eye might have been caused by the explosion? * * *

Was it caused by the explosion? * * * Did the explosion have any effect upon it? A. It was *probably* caused by explosion." (Deposition) (Emphasis supplied.)

Briefly, Dr. Bernfeld was of the opinion that it was "entirely possible" that the trauma disturbed the eye—Dr. O'Connor that it was "possible" that the injury played a part—Dr. Irvine that the detachment was "probably" caused by the explosion. Against these opinions that the trauma *possibly* caused the detachment was the opinion of Drs. Toland, Melton and French " * * that the detachment of the left eye is not related to his injury whatsoever." A compensation claimant must show affirmatively that he was entitled to compensation and must show by reasonable preponderance of evidence that the injury or disability both arose out of and in due course of employment. Johnson v. Industrial Commission, 35 Ariz. 19, 274 P. 161; Blasdell v. Industrial Commission, 65 Ariz. 373, 181 P.2d 620, supra. I submit that the petitioner's showing does not meet the degree of proof required. The insurance fund is not a health fund.

In the latter part of the majority opinion the author takes Dr. Toland to task for persistently refusing to accept the *facts* for the basis of his opinion. Presumably the fact that he purportedly would not accept as true was the answer of Dr. Irvine to question # 12. The question and answer read as follows:

"Q. 12: If, at the time of your first examination (September 6, 1951) you could not determine any evidence of detachment, does that mean the detachment had not started or does it mean that from the symptoms given you by Mr. Jenkins it had started but was not yet visible? A. The latter is correct."

Apparently the *fact* that the author of the opinion thinks that Dr. Toland should have accepted was that at the time of the first examination the detachment had started but was not visible. In a letter to Mr. Lohse, attorney for claimant, Industrial Commission record No. 9, it appears that Mr. Lohse had previously asked the identical question of Mr. Irvine, which was the predicate for question No. 12. The question of Mr. Lohse to the doctor was:

"Does the fact that you could not observe any evidence of the detachment mean that the detachment had not started or does it mean that from the symptoms given by Mr. Jenkins it had started but was not as yet visible to you?"

The answer was:

"*One cannot say whether it had started or not*. The retina below the left eye was not visible because of vitreous opacities and pupillary membrane. The symptoms of the patient are supposition of but not pathognomic of retinal separation at that time." (Emphasis supplied.)

I leave to the reader to determine whether Dr. Toland was right or wrong in his analysis of what Dr. Irvine said. It must be remembered that brief answers to questions cannot be considered as all-inclusive. Especially is this true with technical opinions. Taking the two questions and answers of Dr. Irvine I conclude that he stated *not* that the detachment *had* started and was not visible but rather not being visible it may or may not have started.

In another place in the majority opinion it is stated that the other reason that the *opinion* of Drs. Toland, French and Melton was valueless was because they did not have before them the deposition of Dr. Irvine taken a year after these doctors gave their report and opinion. This states a new rule to me. I never knew it to be the law that because one expert witness did not have before him the opinion of *another* expert witness that for that reason the opinion of the first expert witness was divested of the character of substantial evidence. The opinion of Dr. Irvine given in his deposition, to the effect that the detachment was "probably" caused by the explosion, was predicated upon his original report made in September, 1951, plus the fact that he saw a complete detachment the following January. Dr. Toland, at the time he was examined as a witness and after the original report was made, did have before him the opinion of Dr. Irvine (as if it made any difference) to the effect that Dr. Irvine was of the opinion that the detachment was "probably" caused by the explosion.

The Industrial Commission is a board, created by law and manned by laymen who have a most difficult task and must be guided wholly by their good sense and common judgment. After reading the report of Drs. Toland, Melton and French, I think that as laymen they were entitled to tie on and understand the statement "We are of the opinion that the detachment of the left eye is not related to his injury whatsoever." That language had some meaning to them. They should not be castigated for not knowing and understanding that other language of the report contained a negative pregnant (which in my opinion was not present). If the rule is to be adhered to that the Commission is the trier of the fact, then their judgment must prevail where it is predicated upon a conflict in the testimony. I think it should be a matter of judicial knowledge that the members of this court are laymen and have no more knowledge of the medical sciences than do the lay members who compose the Industrial Commission. This court should not quarrel with the medical opinions of doctors of medicine, and by a process of analysis and dissection, show that their opinions are valueless.

The award should be sustained.