409 P.2d 26

**Manuel G. CHAVARRIA, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona and Pima Mining Company, Respondents.**

**No. 8525.**

Supreme Court of Arizona,

En Banc.

Dec. 23, 1965.

Rehearing Denied Jan. 25, 1966.

Goddard, Gin, Hanshaw & Gianas, Tucson, and Peter C. Neumann, Tucson, of counsel, for petitioner.

Robert A. Slonaker, Phoenix, for Industrial Commission; Richard J. Daniels, Courtney L. Varner, Merton E. Marks, Glen D. Webster, Dee-Dee Samet, Phoenix, of counsel.

STRUCKMEYER, Vice Chief Justice.

Manuel G. Chavarria, by certiorari, seeks in this Court to set aside an award of the Industrial Commission of Arizona based on these facts.

On May 21, 1960, petitioner suffered an injury to his right foot, arising out of and in the course of his employment with the Pima Mining Company, defendant-employer. The injury involved fractures of the cuboid and osteocuboid bones of the right foot with dislocation of the right fourth and fifth metatarsal phalangeal joints. On July 6, 1961, the Commission found that petitioner's condition was stationary and made an award of permanent partial disability based on five per cent loss of function of the right leg. Petitioner protested the award and on April 6, 1962, the Commission affirmed its previous findings and award.

On August 31, 1962, petitioner filed a petition to reopen, asserting a new and additional disability. A Psychiatric Advisory Board was called which, after examination of petitioner, found that his asserted psychoneurotic disabilities were based upon an inadequate personality and recommended that his case be closed. On Janu-ary 8, 1963, petitioner's petition to reopen was denied. To that, petitioner filed a protest and petition for rehearing. On May 10, 1963, a hearing was had, at which petitioner's expert medical witness, Dr. Lindsay E. Beaton, a qualified physician practicing in psychiatry and neurology, testified that petitioner had a "psychological illness" in which his anxieties about himself were converted into physical symptoms; that petitioner felt that his leg was seriously injured and that he would not be able to return to work; that "his own anxiety, his own hypochondriacal conviction about his disability in essence keeps him from returning to work."

On July 19, 1963, the Commission made the following findings of fact:

"1. That applicant has sustained new, additional or previously undiscovered disability attributable to injury by accident arising out of and in the course of his employment * * *.

"2. That applicant is entitled to accident benefits and compensation, *if indicated*, from and after September 13, 1962, *until further order of this Commission*." (Emphasis supplied.)

and awarded:

"1. Accident benefits and compensation, *if indicated*, from and after September 13, 1962, *until further order of this Commission*." (Emphasis supplied.)

■ This award was not protested and became final. It constituted an adjudication that petitioner suffered a conversion hysteria as the result of the accident of May 21, 1960, since the only new additional or previously undiscovered disability which had not been previously passed on by the Commission prior to the May 10, 1963, hearing was petitioner's psychoneurotic condition. The award, itself, is obviously conditional, being an award of accident benefits and compensation, "if indicated," "until further order of the Commission." Undoubtedly the Commission accepted the view that psychiatric disorders are not necessarily permanent, leaving the door open for further evaluation of petitioner's case.

Approximately six months later, on January 17, 1964, petitioner was re-examined by the Commission's Psychiatric Advisory Board. The Board's conclusions were:

"The patient's anxiety state, with its nervous accompaniments, is explicable on the basis of conscious and unconscious guilt. The guilt is not due to the foot injury. It is due to the fact that he has exploited a relatively minor disability to rationalize his withdrawal from competition and to seek more dependency and more compensation than his physical disability really warrants.

\* \* \* \* \* \*

"The patient is rather obviously not totally disabled from psychiatric or any other standpoint. He is ambulatory. He drives a motor vehicle. He undergoes and reacts to this examination with sustained composure. He carries on the every day activities of living in apparently competent fashion.

\* \* \* \* \* \*

"It has been previously emphasized that it would be in the patient's best interest, both physically and psychologically, to return to gainful occupation. Refusal to do so will, in our opinion, be attributable to the patient's basis [sic] inadequacy and current unwillingness. Further medical attention or treatment and further compensation will only serve to re-inforce [sic] and perpetuate the patient's dependency."

This resulted, on February 17, 1964, in a classification by the Commission of petitioner's condition as stationary with no greater disability, physical or mental, than that found under the provisions of the award on April 6, 1962.

Petitioner duly protested and a hearing was held in Tucson, Arizona, on June 8, 1964, at which Dr. Lindsay E. Beaton again testified that petitioner was totally disabled, "primarily due to psychiatric disease" and that this psychiatric disease was a conversion reaction and a hypochondriacal reaction. In response to the question of whether appellant was consciously malingering, Dr. Beaton stated, "I do not believe there is any malingering in Mr. Chavarria."

He identified malingering as the conscious production of symptoms. He stated in response to the question of whether there "should be some potential in this man":

"Physically, I am sure there are many things, but his own attitude is that he can do nothing, and therefore he can't do anything."

The hearing of June 8th was continued to July 13, 1964, when it was resumed. At that time, Dr. William B. McGrath was called, whose specialty is neurology and psychiatry. Dr. McGrath was one of the five psychiatrists who composed the Psychiatric Advisory Board which had examined petitioner on January 17, 1964. He had also examined petitioner on December 24, 1962, at the first psychiatric consultation. Pertinent portions of Dr. McGrath's testimony are set out at length since it is the basis of the award of the Commission which is here under attack.

"Q What were your findings on December 24, 1962, Doctor, in relation to the claimant's psychiatric disability?

"A My findings at that time were that he had a passive inadequate personality and he had a variety of neurasthenic complaints.

\*　　\*　　\*　　\*　　\*　　\*

"Q Did you feel that these findings were triggered or precipitated by the accident of May of 1960?

"A No.

"Q Now, when did you see him the next time, sir?

"A On January 17, 1964.

\*　　\*　　\*　　\*　　\*　　\*

"Q What were your findings at that time, sir?

"A Our findings were essentially the same as those which we had recorded after our examination of December 24, 1962.

\*　　\*　　\*　　\*　　\*　　\*

"Q Did the claimant at that time display to you an actual psychiatric disability?

"A Yes.

"Q What was the manifestation of that disability, sir?

"A Anxiety.

"Q Do you have an opinion as to the relationship such display of anxiety would have to his ability to perform work?

"A Yes.

"Q What would that opinion be, sir?

"A The anxiety alone or the psychoneurosis which was betrayed in the

anxiety would not completely impair an individual like him from working.

"Q What impairment might that anxiety have, sir, in your opinion?

"A Oh, for a while, if he worked, he might work with some unwillingness, some fatigability, some slight nervous tension.

\*   \*   \*   \*   \*   \*

"Q Doctor, you mentioned in your report it is hard to evaluate the degree of disability, the true degree of psychiatric disability, so I assume from your report and your testimony here there is some degree of psychiatric disability from some cause today?

"A Yes.

"Q What is that degree of disability or what was it on the date that you saw the man in January of 1964?

"A I would classify it as slight.

\*   \*   \*   \*   \*   \*

"Q You are familiar with a conversion hysteria, aren't you, Doctor, with this phrase in your specialty?

"A Yes.

"Q Do you feel that Mr. Chavarria has ever suffered from the effects or has had a conversion hysteria in connection with this accident?

"A No.

\*   \*   \*   \*   \*   \*

"Q What did he lack to keep him from being a true conversion hysteric, in your opinion?

"A I think he lacked the relative conviction of the individual who has a true conversion hysteria.

\*   \*   \*   \*   \*   \*

"Q Say he feels the aggression and hostility exhibited by his feeling of maybe people weren't properly caring for him? This could be a symptom of a psychiatric illness, couldn't it?

"A It could be, but in this case I didn't think it was; I thought it was a symptom of his basic personality type.

\*   \*   \*   \*   \*   \*

"Q You question whether there is a traumatic neurosis? You do feel there is an anxiety neurosis?

"A Yes.

\*   \*   \*   \*   \*   \*

"Q Now, in his anxiety neurosis where would you say the focus of his anxiety was?

"A In the conflict between his avowed wish to resume responsibility for himself and the unacknowledged striving not to.

"Q By 'unacknowledged,' you mean there is an element of unconsciousness in that part of it?

"A Yes.

"Q * * * Now, did this man not work because he has a conscious motivation not to work?

"A In part, yes.

"Q The other part is that he has an unconscious motivation not to work, or if that isn't exactly true, the other part would be that he has an unconscious or a psychiatric illness, is that right?

"A Yes.

"Q Is there any way that you can help the Commission by expressing an opinion as to what the overriding reason is that the man does not work? Is it a conscious part or a psychiatric or unconscious part?

"A In my opinion in this case, the conscious unwillingness to return to work is, to use your term, overriding.

"Q If he did not have this conscious motivation, then, it would be your expectation that he would return to work, to some form of work?

"A Yes.

\* \* \* \* \* \*

"Q * * * If a man has this five per cent disability to his foot, does he have any other physical disability—and I am including psychiatric disability—does he have any other psychi-

atric disability in addition to that five per cent?

"A Yes.

"Q Was any part of that additional disability attributable to the accident?

"A In my opinion, no.

\* \* \* \* \* \*

"Q Do you know whether or not there is an actual physical impairment as the result of any psychiatric condition?

"Yes.

"Q What is the impairment, if there is any?

"A There is no real impairment.

\* \* \* \* \* \*

"Q Was it your opinion from that consultation that the claimant was attempting to consciously, we will say, look worse in your eyes than he pos-·sibly was?

"A Yes.

"Q Do you think that the claimant was malingering?

"A In that aspect, yes."

It is apparent from the report of the Psychiatric Advisory Board and Dr. Mc-Grath's testimony that petitioner has a basic personality pattern of the passive de- ; pendency type coupled with an anxiety neurosis and that, if he were not dependent

**322**

for support upon workmen's compensation, he would return to some form of gainful employment. Dr. Beaton and Dr. McGrath are in complete disagreement. Dr. Beaton was of the opinion that petitioner had conversion hysteria caused by the accident. Dr. McGrath and the Psychiatric Advisory Board were of the opinion that petitioner did not have a conversion hysteria and that his asserted disabilities were not caused by the accident. However, as stated, the finding of July 19, 1963, precluded a re-examination of the question of causation at any subsequent time.

But, since finding Number Two must be construed as conditional, the award predicated on it must be held to be a temporary disability award authorized by A.R.S. § 23–1045. Therefore, the Commission was at liberty later to determine whether petitioner's psychoneurotic disability was so disabling as to prevent him from returning to work; that is, that it was not disabling to the point of producing a loss of earning capacity. This the Commission did on August 27, 1964, when it found that petitioner's condition was stationary and that he had no greater disability in excess of the provisions of the award of April 6, 1962.

It is a well established rule that, where equally honest and experienced expert witnesses reach opposite conclusions, this Court will not say that it was the Industrial Commission's duty to accept the opinion of one over that of another. Condos v. Industrial Commission, 92 Ariz. 299, 376 P.2d 767; Parnau v. Industrial Commission, 87 Ariz. 361, 351 P.2d 643; Hewett v. Industrial Commission, 72 Ariz. 203, 232 P.2d 850. In Condos, we said:

"We do not decide here that either of these doctors are right, or wrong. We merely indicate there is a conflict and that it was resolved by the Commission in such a way that their findings are reasonably supported by the evidence." 92 Ariz., at 301–302, 376 P.2d at 768.

We think this case is controlled by these decisions. The Commission could find, as it did on August 27, 1964, "that neither the industrial injury nor any subsequent residual physical or functional disability causally related thereto prevents the applicant from returning to his regular employment." Cf. Murray v. Industrial Commission, 87 Ariz. 190, 349 P.2d 627. It could conclude that the best treatment was to take petitioner off compensation, thereby giving him the incentive to return to regular employment.

The award is affirmed.

LOCKWOOD, C. J., and BERNSTEIN, UDALL, and McFARLAND, JJ., concurring.