[Civil No. 3732. Filed July 13, 1936.]

[59 Pac. (2d) 649.]

R. L. ISON, Petitioner, v. WESTERN VEGETABLE DISTRIBUTORS, Defendant Employer; THE INDUSTRIAL COMMISSION OF ARIZONA, Defendant Insurance Carrier, Respondents.

Mr. Terrence A. Carson, for Petitioner and Mr. Emil Wachtel (of Counsel).

Mr. Don C. Babbitt and Mr. Howard A. Twitty, for Respondent Industrial Commission.

LOCKWOOD, C. J.— This is an appeal from an award of the Industrial Commission of Arizona, hereinafter called the commission, denying compensation to R. L. Ison, hereinafter called the petitioner, for injuries which the latter alleges he received as the result of an accident arising out of and in the course of his employment. The commission made the following finding, which was challenged by the appeal:

"That the evidence is insufficient to establish that said applicant sustained any injury by accident arising out of and in the course of his said employment on or about said date; and the evidence is further insufficient to establish that the disability from which said applicant alleges to be suffering is proximately the result of accident."

This finding is, in reality, a finding upon two issues of fact; the first being that the evidence is insufficient to show the accident upon which the petitioner relies happened; and, second, that even assuming there was an accident, the evidence is insufficient to show that the disability from which the petitioner admittedly has suffered was caused by the accident. We must, therefore, consider the testimony in the case, and, in so doing, are bound to apply the rule to which we have adhered consistently, that if there is reasonable evidence sustaining the award of the commission, this court will not set it aside.

We consider first the evidence in regard to the alleged accident. It is the contention of petitioner that while he was engaged in putting tops on certain lettuce crates by means of an electric lidding press, a crate on which he was working was ejected from the press in such a manner as to hit him a severe blow upon the chest, and that as a result of such accident his lung became abscessed, so that he lost four months' work. In support of the fact that the accident did occur, we have the testimony of the petitioner himself, the affidavit of one James F. Brown, who apparently saw the crate hit petitioner; the testimony of the witness Akin, who did not actually see the accident but saw the crate of lettuce scattered over the floor immediately after the accident was said to have occurred, and heard petitioner complain the next day of being hit; and the testimony of witnesses Roach and Sprankle, who also heard petitioner complain of the accident the day after it happened. As opposed to this, we have the statement of the employer's foreman, who said that while he heard the petitioner claim his side hurt him shortly after the accident, he did not state that the pain was caused by the accident until the time when he went to the

hospital, nearly thirty days after the alleged accident. On this evidence, was the commission justified in the finding that it was not proved the accident occurred?

We have held that in view of the interest of an applicant for compensation, the commission is not required, as a matter of law, to accept his uncorroborated testimony in regard to an accident. *Davis* v. *Industrial Commission,* 46 Ariz. 169, 49 Pac. (2d) 394. But we have also held in several civil cases, and we think the same rule applies to compensation cases, that triers of fact may not disregard the undisputed testimony of witnesses who have no interest in the matter, unless their testimony is unreasonable or impeached by some of the circumstances of the case. *Otero* v. *Soto,* 34 Ariz. 87, 267 Pac. 947; *Equitable Life etc. Soc.* v. *De Johnson,* 36 Ariz. 428, 286 Pac. 817. Applying this last rule, we think the commission was not justified in disregarding the affidavit of Brown, which is, in substance, that he saw the accident occur, especially when corroborated by the testimony of the other witnesses in regard to the complaints made by petitioner shortly after the accident. We hold, therefore, that the finding that there was insufficient evidence to show that the petitioner was injured by an accident arising out of and in the course of his employment on April 9, 1935, is not sustained by the record.

We consider next the question of whether any disability arose from the accident and injury. It is not every accident nor every injury arising from an accident which is compensable. The theory of the law is that it is only injuries which produce financial loss to the injured party that are compensable. Sections 1421, 1438 (as amended by Laws 1933, 1st Sp. Sess., chap. 11, § 6), Rev. Code 1928. The petitioner claims compensation for loss of time which

he alleged was caused by the accident and injury. It is admitted that he was compelled to go to the hospital for a chest affection on April 28th, and that by reason of such affection he lost about four months' time from his work, being apparently perfectly recovered after that period. The question then is, Was the condition which caused his hospitalization and subsequent loss of time caused by the accident of April 9th? Like most cases, where the injury is not an immediate and patent one, such as the loss of a member or a broken limb, the question of causal relation between the accident and the disability depends upon expert medical testimony. Two expert medical witnesses gave evidence on this point, Dr. Fred G. Holmes, and Dr. Coit I. Hughes, both of them thoroughly qualified physicians. Dr. Hughes first saw petitioner on April 28th. After examination, he sent him to a hospital, and diagnosed his case as being a ruptured blood vessel in the lung which had produced a clot of blood, blocking a bronchial tube, which eventually resulted in an abscess of the tube. He judged, from the history of the case given him by the patient, that the original cause of the lung condition was the blow received from the crate of lettuce on April 9th. Dr. Holmes examined the patient some time later, but prior to June 18th. He also examined the X-rays taken of the patient while he was in the hospital, and had other X-rays taken at the time of the physical examination made by him, and secured a full history of the case. He made a very full report, which was characterized by Dr. Hughes as being very fair, and reached the following conclusion:

"It would seem that all of the symptoms in this case would be adequately explained by a pneumonia with possible small abscess formation starting the latter part of April and concluding after eight days in the hospital. His pain on taking a deep breath

is undoubtedly due to some lung adhesion on this side following this condition. Whether one may in any way ascribe this pneumonia with probable lung abscess to his accident on April 10th is difficult to say. If the history as obtained is correct that he did not show any sickness from April 10th to April 28th, it would seem that eighteen days intervened before his pneumonia. A pneumonia following a severe contusion to the chest is possible but quite rare. However, such a pneumonia would be expected to supervene within three or four days or at most a week. It is felt that pneumonia is usually due to a plug in a bronchus and there is no reason to think that such a plug should wait for several weeks to form. It is very rare to find an abscess formation following an injury to the chest. Any injury to the chest which is not sufficiently severe to stop him from working would be most improbable as a cause of a pneumonia two weeks later. One cannot absolutely exclude an old tuberculosis in this case, but I believe that all of the symptoms and findings can be just as well accounted for as following his acute pneumonia with probable lung abscess early in May.''

It will be seen by this that Dr. Holmes agreed with Dr. Hughes in diagnosing petitioner's trouble as a lung abscess, but concluded that it was very improbable that it was caused by the blow on the chest of April 9th. We have, therefore, the opinion of two reputable physicians in direct conflict as to whether it appeared affirmatively that the abscess was the result of the blow. It is, of course, the law that the petitioner must establish his case by a preponderance of the evidence upon every material point in compensation cases in the same manner as the plaintiff in civil actions. *Ocean Accident & Guarantee Corp.* v. *Industrial Com.*, 32 Ariz. 265, 257 Pac. 641; *Johnson* v. *Industrial Com.*, 35 Ariz. 19, 274 Pac. 161. Preponderance of the evidence means such evidence as when weighed with that opposed to it has more convincing force, and from which it results that a

greater probability is in favor of the party upon whom the burden rests. It does not necessarily depend upon the number of witnesses; it merely means that the testimony which points to one conclusion appears to the trier of facts to be more credible than the testimony which points to the opposite one. *The capacity of the submitted testimony to enforce belief on the arbiter to whom it is submitted is the touchstone of preponderance as applied to the testimony of witnesses.* With this rule for our guidance, can we say affirmatively that the preponderance of the evidence as to the causal connection between the accident and the bronchial abscess is, as a matter of law, with the petitioner? Obviously, when two equally honest and experienced expert witnesses reach opposite conclusions, the only thing the trier of fact can do is to decide which one of these witnesses is more probably correct in his conclusion. In so doing, he may take into consideration the experience of the witnesses in diagnoses of ailments of the kind under consideration, and their interest or bias, conscious or unconscious, in the result to be reached. Applying these rules, we think it is clear to any fairminded layman that it cannot be said affirmatively that, as a matter of law, it was the duty of the commission to accept the opinion of one medical witness over that of the other. Such being the case, we are bound by the conclusion which it has reached as to which witness was more probably correct. It is urged that the testimony of one physician is positive that the injury caused the abscess, while the other merely states that it was extremely probable that it did not, and that the commission should, therefore, have accepted the positive testimony over that which was merely conjecture. There might be some merit in this contention if the point at issue was one which was subject

to positive knowledge, such as the presence or absence of a certain person, a collision between two automobiles, or other similar matters; but the question is necessarily one of opinion and not of knowledge, and, when this is so, the fact that one opinion is expressed more positively than the other, does not, as a matter of law, require that a trier of fact give it more weight. We are compelled to hold, therefore, that the conclusion of the commission that it does not appear affirmatively that there was any causal connection between the accident of April 9th and the disability from which petitioner admittedly suffered, must be upheld.

▉▉▉▉ The next question, however, and one which is of the first impression in this state, is whether or not the petitioner has been denied that due process of law guaranteed him by the Fourteenth Amendment to the Constitution of the United States. Petitioner's position on this point apparently is that the Industrial Commission of Arizona, by reason of the fact that, in addition to its duties of making awards in cases where compensation is asked, it is also charged with the care and custody of the state compensation fund, cannot be, within the meaning of the constitutional provision referred to, that fair and impartial tribunal which every man is entitled to in determining his legal rights. In support of this contention, petitioner relies primarily upon two federal cases, the first being that of *Tumey* v. *Ohio,* 273 U. S. 510, 47 Sup. Ct. 437, 444, 71 L. Ed. 749, 50 A. L. R. 1243, and the second that of *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 40 Sup. Ct. 527, 528, 64 L. Ed. 908. In the first case, the situation was substantially as follows: Under the statutes of Ohio, the mayors of certain villages were given jurisdiction to try cases involving a violation of the Pro-

hibition Act of the state. In case of a conviction, the mayor was paid the amount of his costs as taxed under the statute; but in case of an acquittal, he received no fee. The fines collected were paid, half to the general revenue fund of the state and the other half to the general fund of the municipality. Error lay from the mayor's court to the court of common pleas of the county, but the review in that court in respect to evidence was such that the judgment could only be set aside if. the evidence was insufficient to the extent that it indicated prejudice or bias on the part of the trial court. The Supreme Court of the United States, in passing on the question, said as follows:

"From this review we conclude that a system by which an inferior judge is paid for his service only when he convicts the defendant has not become so imbedded by custom in the general practice, either at common law or in this country, that it can be regarded as due process of law, unless the costs usually imposed are so small that they may be properly ignored as, within the maxim *de minimis· non curat lex.*"

"The mayor received for his fees and costs in the present case $12, and from such costs under the Prohibition Act for seven months he made about $100 a month, in addition to his salary. We cannot regard the prospect of receipt or loss of such an emolument in each case as a minute, remote, trifling, or insignificant interest. It is certainly not fair to each defendant brought before the mayor for the careful and judicial consideration of his guilt or innocence that the prospect of such a prospective loss by the mayor should weigh against his acquittal. . . .

"But the pecuniary interest of the mayor in the result of his judgment is not the only reason for holding that due process of law is denied to the defendant here. . . .

"The mayor is the chief executive of the village. He supervises all the other executive officers. He is

charged with the business of looking after the finances of the village. It appears from the evidence in this case, and would be plain if the evidence did not show it, that the law is calculated to awaken the interest of all those in the village charged with the responsibility of raising the public money and expending it, in the pecuniarily successful conduct of such a court. The mayor represents the village and cannot escape his representative capacity.''

In the Ohio Valley Water Company case, a state public service commission was given the power to fix the value of the water company's property for rate-making purposes, and while an appeal was granted to the superior court, it was held by the Supreme Court of Pennsylvania that such court had no right to substitute its own independent judgment on the valuation for that of the superior court, but was confined to considering whether there was any reasonable evidence sustaining the finding of the commission. The majority opinion of the Supreme Court of the United States held:

''Looking at the entire opinion we are compelled to conclude that the Supreme Court interpreted the statute as withholding from the courts power to determine the question of confiscation according to their own independent judgment when the action of the commission comes to be considered on appeal.

''The order here involved prescribed a complete schedule of maximum future rates and was legislative in character. *Prentis* v. *Atlantic Coast Line R. Co.,* 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150; *Lake Erie & W. R. Co.* v. *State Public Utilities Commission,* 249 U. S. 422, 424, 39 Sup. Ct. 345, 63 L. Ed. 684, 687 [P. U. R. 1919D 459]. In all such cases, if the owner claims confiscation of his property will result, the state must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void be-

cause in conflict with the due process clause, Fourteenth Amendment.''

It thus appears that the situation upon which the two opinions cited by petitioner were rendered differed greatly from that found in the present case, both as to the facts and the legal issues arising from such facts. In both of the cited cases, the appellant was in the position of a defendant against an action by the opposite party; in the first case defending against a criminal prosecution, and in the second case defending against a valuation of its property which would necessarily greatly lessen its income. In the present case, the petitioner was not brought before the commission against his will, nor by any act on its part. He invoked its jurisdiction voluntarily, for the purpose of securing from it an affirmation of an alleged right, created by the same act which made the commission the judge as to whether such right existed in a particular case. It is the general rule of law that when a party invokes the benefit of a statute, he may not, in one and the same breath, claim a right granted by it and reject the terms upon which the right is granted. *Tovrea Packing Co.* v. *Live Stock Sanitary Board,* 44 Ariz. 151, 34 Pac. (2d) 420. Our Compensation Act (Rev. Code 1928, § 1391 et seq., as amended) is elective so far as the workman is concerned; he may either claim compensation under the terms of the statute, or may reject it and rely upon his common-law action of negligence; or, if he prefers, he may proceed under the Employers' Liability Law described in section 7, article 18, of the Constitution of Arizona. It is true that the employer has no right of election, and to such an extent the law is not a voluntary one, but it is very generally held that an employer may not claim an act to be unconstitutional upon grounds which affect only an employee,

and we think in reason and common sense the converse applies, so that the employee cannot claim that an act is unconstitutional as to him merely because it might be as to the employer. The Supreme Court of the United States, in the case of *Booth Fisheries Co.* v. *Industrial Commission,* 271 U. S. 208, 46 Sup. Ct. 491, 70 L. Ed. 908, in discussing the very point under consideration at the present time, says as follows:

"It is argued that the employer in a suit for compensation under the act is entitled under the Fourteenth Amendment to his day in court, and that he does not secure it unless he may submit to a court the question of the preponderance of the evidence on the issues raised.

"A complete answer to this claim is found in the elective or voluntary character of the Wisconsin Compensation Act. . . .

"If the employer elects not to accept the provisions of the Compensation Act, he is not bound to respond in a proceeding before the Industrial Commission under the act, but may await a suit for damages for injuries or wrongful death by the person claiming recovery therefor, and make his defense at law before a court in which the issues of fact and law are to be tried by jury. In view of such an opportunity for choice, the employer who elects to accept the law may not complain that in the plan for assessing the employer's compensation for injury sustained, there is no particular form of judicial review. This is clearly settled by the decision of this court in *Hawkins* v. *Bleakly,* 243 U. S. 210, 216, 37 Sup. Ct. 255, 61 L. Ed. 678, 684, Ann. Cas. 1917D 637, [13 N. C. C. A. 959].

"More than this, the employer in this case having elected to accept the provisions of the law, and such benefits and immunities as it gives, may not escape its burdens by asserting that it is unconstitutional. The election is a waiver and estops such complaint. *Daniels* v. *Tearney,* 102 U. S. 415, 26 L. Ed. 187; *Grand Rapids & I. R. Co.* v. *Osborn,* 193 U. S. 17, 24 Sup. Ct. 310, 48 L. Ed. 598. The counsel for the plaintiff in error relies chiefly on the case of *Ohio Valley*

*Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 40 Sup. Ct. 527, 64 L. Ed. 908 [P. U. R. 1920E 814]. That case does not apply. An order of a public service commission in fixing maximum rates for a water company was there attacked on the ground that the rates fixed were confiscatory. It was held that the law creating the commission, which had operated to withhold an opportunity for appeal to the courts to determine the question, as a matter of fact and law, whether the rates were confiscatory, could not be sustained, and was in conflict with the due process clause of the Fourteenth Amendment. But in that case, the water company was denied opportunity to resort to a court to test the question of the confiscatory character of its rates and of its right to earn an adequate income. Here the employer was given an election to defend against a full court proceeding but accepted the alternative of the Compensation Act.''

We are of the opinion that, applying the reasoning of the Booth case to the present case, petitioner is not in a position to question whether that provision of the Compensation Law, giving to the Industrial Commission the jurisdiction to sit in a *quasi*-judicial capacity for the purpose of determining whether a given case falls within the terms of the law, is in contravention of the Fourteenth Amendment to the Constitution of the United States.

But assuming, for the purpose of argument only, that the petitioner may question the constitutionality of that feature of the law to which we have just referred, on the ground that the Industrial Commission as created by the statute is not, within the meaning of the Fourteenth Amendment, a fair and impartial tribunal, let us examine the situation to see whether his claim is justified. It is, of course, generally true that officers acting in a judicial or *quasi*-judicial capacity are disqualified by their interest in a controversy to be decided from sitting therein. *Tumey* v. *Ohio, supra.* But it is frequently

a close question as to what the degree or nature of the interest which would disqualify a judge must be. It is not always that the question of judicial qualification involves the constitutional validity of a law. For example, matters of relationship with the parties, or general state policy, are generally held to be questions of legislative discretion, not rendering a judge constitutionally incompetent to try a case. So far as we are aware, it is only when the judge has a direct, personal, substantial, pecuniary interest in reaching a conclusion against a litigant that it is held the due process provision of the Constitution is violated by permitting him to act, and even in such circumstances, if there is no other judge with jurisdiction to determine the question at issue, it is sometimes held that interest of the nature just referred to does not constitutionally disqualify a judge. *Tumey* v. *Ohio, supra.* In the present case, if the Industrial Commission may not hear and determine compensation cases, there is no tribunal authorized under the law of Arizona to do so, and the whole act is inoperative, and those claimants justly entitled to compensation will be unable to obtain it. We think this alone would be sufficient to cause us to determine that the act is not unconstitutional on the ground set up by petitioner.

But going a step further, what is the nature of that interest of the commission which it is claimed constitutionally disqualifies it from hearing compensation cases? The three members of the Industrial Commission are appointed by the Governor, by and with the consent of the Senate, and are removable by him for cause. We must presume he will choose honest, intelligent and competent commissioners, or that, if inadvertently he has been in error in his judgment that his appointees possess such

qualifications, he will exercise his power of removal, for the law assumes public officers will do their duty. Such being the presumption, have such commissioners "a direct, personal, substantial, pecuniary interest" in reaching a conclusion that claimants are not entitled to compensation? The salaries of the commissioners are neither increased nor diminished by any conclusion they may reach in regard to the payment of compensation. The state compensation fund is not raised by taxation upon the property of citizens in general. It comes from an annual assessment upon the pay-rolls of the various employers who are protected by the fund; the rate to be fixed by the commission so that the fund will be self-supporting and no more. Sections 1413 and 1427, Rev. Code 1928. The only interest which any commissioner could, by the wildest flight of imagination, be conceived to have in denying compensation to one entitled by law to receive it, is a desire to satisfy the employing class of the state by keeping the pay-roll assessment low. On the other hand, it might well be said there is an equal inducement to satisfy the more numerous employee class by making awards more liberal than the law permits. We think it is plain it cannot be presumed an honest commissioner would be biased by either motive. So far as we can see, a tribunal selected in the manner the law directs the commission to be chosen, will presumably be as impartial in making decisions as any other which could be established. As in all cases, assuming him to be honest, the character, temperament and general social point of view of the individual and disinterested trier of fact, be he commissioner, judge or juror, always will be the final determinant of the result which he will reach in a given case, if the evidence is doubtful or close, and

this is something which cannot be changed nor prevented by any conceivable law.

 It is urged that the commission has shown clearly by its past record that it will invariably accept the testimony of its own medical adviser and its medical rating board as against the opinion of the medical witnesses appearing for a claimant, and that this fact establishes definitely that it is not a fair and impartial tribunal, but is biased and prejudiced. Whether this alleged attitude of the commission exists in all cases which come before it, we have no means of knowing, but it does appear from the cases which have come before us that such is its general custom. We think, however, assuming the fact to be true, there is perhaps a reason therefor which has not been fully considered by those who contend this practice shows bias and prejudice against a claimant. It must be presumed the commission chooses a medical adviser because its members have confidence in his integrity and ability, for if the commissioners are honest men themselves, these above all things are the qualifications which they will necessarily desire in a medical adviser. He is upon a fixed salary, and certainly has no pecuniary interest in either advising that compensation be granted or that it be denied, for his income is in no way affected by the award made by the commission. The medical rating board, which is apparently the final medical authority whose opinion in doubtful cases the commission is apt to take, even in preference to that of its own chosen adviser, is selected in a manner entirely different. The president of the Arizona Medical Association selects a number of specialists in the various lines of medicine and surgery, in accordance with his judgment, to be the permanent industrial relations committee of the association, and this committee is requested by the

commission to act as a medical rating board. These experts meet from time to time to examine those claimants concerning whose condition and right to compensation there is doubt, from a medical standpoint. Their compensation for so doing is fixed by and paid by the commission, regardless of the nature of their recommendations. It seems to us beyond any reasonable probability that a board composed, as we know from the frequent reports which we have examined, of men of the very highest standing in their chosen profession, would render a report based on anything but their honest opinion and their best skill. And it appears that any tendency on the part of the commission to accept the professional opinion of such experts rather than that of the other experts who, though of equal standing in the profession, in most cases are dependent on an award being made to the claimant for compensation for their services, and who have been selected as witnesses only after the claimant has ascertained their testimony will support his claim, is explained reasonably on the theory that the commission believes a witness who has an interest in the result of a case and has been called because the party knows in advance his testimony will be favorable, is more apt to be biased, even unconsciously, and therefore mistaken in his judgment, than one who has no financial interest in the nature of the award, and is not chosen because of a previously expressed opinion in the instant case, but whose testimony will be used in all cases which he examines, regardless of whether it favors a claimant or not.

The testimony of expert witnesses selected and paid for by the litigants is so notoriously unreliable that it has even passed into a proverb, and the positive, comparative and superlative degrees of prevaricators are frequently illustrated by ''the liar, the —— liar,

and the expert witness.'' This fact has been recognized by our legislature, and it has provided, in substance, that in civil actions for personal injuries the court may select expert medical witnesses to examine the injured party and to testify concerning his condition. Section 4468, Rev. Code 1928. Certainly, under all these circumstances, we cannot say the fact that the commission believes the experts not chosen by the interested party rather than the ones he has selected shows, as a matter of law, that as a trier of fact it is not fair and impartial. We realize that all men are liable to error at times, and we have no doubt that there have been cases where the medical adviser of the commission, the medical rating board, and the commission itself have made mistakes, but in view of all these things which we have set forth, we think that to hold the method of choosing expert advisers, such as the commission has adopted, and its habit of believing such advisers, is a denial of due process of law and of a fair and impartial hearing, would be without any base in reason or probability.

Finally assuming, solely for the purpose of argument and without any intimation on our part that it be true as a matter of fact, that everything that petitioner in this case has asserted or even suggested in regard to the commission is true; that its awards are, in many cases, unfair to claimants; that it wilfully and even maliciously and corruptly is seeking to deny just compensation where it is due, we think it is evident from our review of the method of choosing the commission, its powers, duties, and interest, and its method of determining which witnesses should be believed, that the trouble is not with the *system* established by law and by the rules of the commission, but solely with the individual commissioners, and that petitioner's charges, in effect, are

that the commissioners themselves are wholly unfit, either by temperament or character, to hold the positions which they occupy. If these charges are true, and of course we express no opinion in regard to that matter, the remedy is political and not legal. It is not the system which should be changed, but the individuals who administer it. If an individual judge is incompetent or corrupt, we do not, on that account, attack the organization of the courts; we remove the individual and secure a better man.

We hold, therefore, that the petitioner in this case has had an opportunity to present his claim before a tribunal which, in its essential nature, is presumably fair and impartial, and which is not disqualified by any interest from sitting on compensation cases. Whether a mistake has been made in the conclusion which the commission has reached on conflicting evidence in the present case, is not within our province to determine.

The award is affirmed.

McALISTER and ROSS, JJ., concur.