276 P.2d 542

Oren BRADSHAW, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, and B. F. Hill, J. J. O'Neill, and F. A. Nathan, members of the Industrial Commission of Arizona, Respondents,

and

Arizona Highway Department, Respondent-Employer.

No. 5918.

Supreme Court of Arizona.

Nov. 15, 1954.

Richard S. Gilmore, Glendale, for petitioner.

John R. Franks, Phoenix, Donald J. Morgan and Robert K. Park, Phoenix, of counsel, for respondent Industrial Commission.

PHELPS, Chief Justice.

Petitioner Oren Bradshaw seeks by certiorari to have the award of the Industrial Commission made on February 24, 1954, set aside. There are no specific assignments of error anywhere in the record but the burden of petitioner's argument seems to be that the award is not supported by the evidence and is contrary thereto.

On March 26, 1953, while petitioner was in the employment of the State Highway Department he sustained an injury to his lower back in what is described as the lumbar area. The injury was reported to the Industrial Commission and on April 28 of that year it found that the injury occurred by accident arising out of and in the course of his employment and it awarded accident benefits to petitioner but found that he was not entitled to compensation upon the ground that he was not disabled for work in excess of seven days and that he suffered no physical disability as a result of said accident.

Petitioner was treated by Doctor F. P. McCann, D. O., of Peoria, who diagnosed his injury as "acute traumatic injury to low back." The doctor treated him by tape strapping, RX diathermy, massage and exercise, with satisfactory results. He discharged petitioner as cured on March 30, 1953, with the report that there was no physical or functional impairment of any kind as a result of the injury.

Petitioner returned to his work upon his discharge by Doctor McCann. He testified that his back continued to "bother" him all the time. He was given light work by his boss, Mr. J. A. Cardon (this is corroborated by Mr. Cardon), and he stated by favoring his back he was able to get by pretty well until around August 10 when his hip and leg "started bothering" him. He stated his back "bothered" him when he did any heavy lifting or if he strained himself "just right". He especially noticed an increase of pain in the lower back in August after hauling and helping to unload a truck load of cement. The pain of which he complained was at the same place in the back that it was at the time of his injury of March 26. Because of the peculiar situation here involved, we deem it best to specify dates on which the material events took place.

Petitioner continued to work until September 5 when he said because of severe pains in the lower back he had to take sick leave. Around August 20 petitioner began to receive treatments from Doctor McCann, at first every other night and later every night after he got off work until he was referred by Doctor McCann to Doctor H. F. Steelman, M.D., on Septem-

ber 21, 1953. This referral was made according to Doctor McCann, because of the fact that petitioner had not responded satisfactorily to conservative treatment given him.

On September 22, 1953, Doctor Steelman wrote a letter to Doctor McCann giving him a full report of the result of his examination of petitioner, a copy of which report was filed with the commission on October 17, 1953. In this report, among other things, he stated he found:

"1. Degenerative disc changes between L–5 and S–1;

"2. Slight narrowing of disc space between L–4 and 5, but not significant of marked disc damage at this level; and

"3. Lumbar-sacral spine otherwise normal."

On October 24 petitioner filed with the commission a petition and application for readjustment or reopening of claim AK 6465 involving his injury of March 26. In this petition and application he states:

"On 3–26–53 was injured while working, was laid off, but went back to work after one week, when I thought I was able to work—went back to work too soon, so had more trouble with my back.

"While hauling cement about the 10th of August, 1953, hurt my back again, but continued to work until Sept. 5th, 1953. Was under Doctors' care from Sept. 5th, 1953, to Oct. 7th, 1953, when I was sent to Hospital.

"Reason for not filing for compensation was that I thought I would soon be able to go back to work. Am now confined to bed at home with leg stretch.

"Oren M. Bradshaw."

On October 28, 1953, Doctor James R. Moore, M.D., medical advisor for the commission on specific request by it examined the file in the case and gave as his opinion that:

"The records indicate this man had leg pains for eight weeks, the onset being without trauma, that he had back trouble previously five years ago, with illness for two years. The records do not indicate that the present condition is due to the accident of March 26, 1953."

Thereupon on November 2, 1953, the commission made and entered its findings and award based on Doctor Moore's report, that there was insufficient medical evidence that applicant was suffering any new additional or previously undiscovered disability attributable to said injury of March 26, 1953 and affirmed its previous award of April 28, 1953.

In due time petitioner filed his application and petition for rehearing and requested an opportunity to cross-examine Doctors James R. Moore and H. F. Steelman and to examine Doctor E. P. McCann, family physician of petitioner. Pursuant thereto

a rehearing was ordered and on December 29, 1953, a full hearing was conducted at which time all doctors named in the application testified. Petitioner and J. A. Cardon, "boss", also testified. At the close of the hearing the matter was submitted to the commission for consideration and decision and on February 24, 1954, it rendered its decision, findings and award affirming its finding and award of November 2, 1953. It is this award that petitioner seeks to set aside.

■ It will be necessary to carefully examine the evidence in the case in order to determine the questions presented. If there is a conflict in the evidence on a material issue of fact or if there is substantial evidence to support the finding and award of the commission even in the absence of conflict in the evidence we are bound thereby and may not disturb such award. Blasdell v. Industrial Commission, 65 Ariz. 373, 181 P.2d 620; West Chandler Farms Co. v. Industrial Commission, 64 Ariz. 383, 173 P. 2d 84; Davidson v. Industrial Commission, 72 Ariz. 314, 235 P.2d 1007.

As above stated the award of April 28, 1953, was based exclusively upon the above report of Doctor James R. Moore to the commission on October 28, 1953, in which he stated:

"* * * The records do not indicate that the present condition (of petitioner) is due to the accident of March 26, 1953."

In our opinion this statement conflicts with the testimony of Doctors McCann and Steelman relating to the same subject matter and unless the testimony of Doctor Moore at the hearing of December 29, 1953, either refutes or materially modifies that statement the finding and award of the commission must be sustained.

In his testimony at the hearing Doctor Moore stated that he had never personally examined petitioner but, at the specific request of the commission he gave it the opinion above quoted based upon a review of the files then in the case. He then continued:

"* * * and I believe those observations were confirmed in the testimony that was given here this morning. A final opinion would not be one now for me to make, but the Commission, I believe. In other words, the records do not indicate that the present condition is due to the accident of March 26th, '53. In other words, 'the records do not indicate that the present condition is due to the accident of March 26th, '53.' That statement was based merely upon the medical evidence that was submitted in the file and that was available to me (at that time)."

It is not entirely clear just what Doctor Moore meant in making the above statement unless he intended to convey that it was now for the commission to say whether the records do not now indicate that petitioner's present condition is due to the accident of March 26.

He then testified that after hearing the testimony of Doctors Steelman and McCann and in view of petitioner's testimony in regard to his working habits in the last several years, he didn't believe he could honestly say whether the disability from which petitioner was suffering at the time of the hearing was or was not new and additional disability arising out of that first accident. He continued:

"* * * Here is an incident that occurs, and to attribute the present condition *solely* to that one incident would be most difficult. In this review here that was made, it was not taken into account that he had had an exascerbation (increase in the severity of any symptoms or disease—The American Illustrated Medical Dictionary, Dorland, 21st ed.) of his trouble in September, because the only question that was asked me in that was if it was new and additional disability due to this original accident. *In other words, I was not basing that on personal examination and observation, but merely upon the medical evidence that was submitted, and that medical evidence did not show then that it was new to that. Now, then, still without any physical examination of my own and just from the medical evidence alone, it would be pretty difficult for me to give an accurate opinion as to whether that accident was solely responsible for the present condition.* It would appear to me to be more in the nature of one of the incidences that had occurred in a number of episodes of back trouble." (Emphasis supplied.)

It will be observed that he states above that it would be difficult for him to give an accurate opinion as to whether the accident of March 26 was *solely* responsible for petitioner's present condition.

Doctor Moore was then informed that the Veterans' Administration had authorized the examination of their records in regard to Mr. Bradshaw which included their x-ray reports and history of treatment and diagnosis of petitioner since this 1949 episode had been reported (the 1949 episode referred to was of a back ailment of petitioner which was diagnosed to be arthritic in character), and was asked if he would care to examine that file. Doctor Moore responded:

"Well, of course, the case would be more complete, but I doubt very much if it would be of a great deal of assistance, because I think the statements of Doctor McCann and also the rather full report of Doctor Steelman cover the case quite thoroughly, and I don't think there is any question with reference to the diagnosis and the condition that is present. The only question that arises is did it result from this one incident that happened in March. As I see it, from the Commission's standpoint, that is all they are wanting to determine, and I don't see where the information

which would probably be supplied and would undoubtedly correspond with the findings at least of Doctor McCann and Doctor Steelman would throw further light on that."

On cross-examination Doctor Moore was asked:

"Q. As I understand your testimony, Doctor, you are saying that you don't feel, without having made any examination of this man yourself, that you can yourself make an opinion as to whether or not this March accident is the cause of his present trouble or whether or not it results from that accident or is in some way tied in with that March accident. You don't feel that you could state any opinion yourself, is that true? A. Well, that would necessarily stand up. I might add that possibly as a result of an examination I wouldn't be any closer than I am now because of the fact that Doctor Steelman has made a very thorough report, and I think it is clear enough, his supposition of what the condition is. I am not questioning that.

"Q. Well, you are not saying that in your opinion there could not be some relation or some correlation between the March injury and the present condition? A. No."

The testimony of petitioner to which reference was made in questioning Dr. Moore is as follows:

"Q. Prior to March 26, 1953, I believe there is something in the record here to the effect that five years or so ago you received a back injury, is that true? A. No, I didn't receive a back injury. I got down in my back. I went to the Veterans' Bureau with it, and didn't go to a doctor with it. I went to the Veterans' Bureau to try to find out, and they said I had a touch of arthritis, and I fooled around with it, and so I decided in the summer I was going to go to Oregon and I went to Oregon and on the trip up there I got completely over it. It sounds fishy. These doctors laugh at me because I said I went to Oregon and got over it. I went up there and within a week's time after I got up there, I worked steady every day.

"Q. Do you recall what year it was when you went to Oregon, the summer of what year? A. I went up there in I think it was the summer of '49.

"Q. Between the summer of '49 and the 26th of March of this year, did you notice that your back bothered you in your work, and so forth? A. My back didn't bother me to work. I worked in the gins eleven hours a day, seven days a week for two winters and worked on odd jobs in between, built my home in between and I never had no back trouble with it.

"Q. You mentioned that you worked in the gin. That was for the

Patterson Ginning Company in Peoria, was it not? A. That was Patterson.

"Q. And Mr. Pullins who is the general manager, did make an affidavit just last week, did he not, relative to your employment by them? A. Yes, I worked there up until the time—Well, I went to work for the state about a week after I got out there.

"Q. You worked from September, 1950, through October 3, 1952, for the Patterson Ginning Company, is that true? A. That is right."

The witness stated that he was in an automobile accident in 1921 in which he was thrown 65 feet but that it did not hurt his back, that only his neck was injured which bothered him for a considerable time but that his neck had not bothered him for the last twenty years. He was then asked the following question:

"Q. Back in August of this year, you say around the 20th, when your back became worse leading up to your being unable to work in September, do you recall any injury or any specific thing that happened to cause it to get worse or was it just in the course of your employment in lifting this cement? A. I'd say it was just caused it getting worse because I tried to favor it all the time. The morning I went to haul cement, the boss wanted to know if I could haul it, I had been complaining of my back, and I said that I could so we went ahead and hauled . * * *.

Anyway, him and I went and hauled cement.

"Q. It was heavier work than you had been doing, it that right? * *. A. That is right."

It appears to us that an analysis of Doctor Moore's testimony which we believe to be very forthright indicates that after hearing the testimony given at the rehearing on December 29, 1954, he has receded from his statement in his report of October 28 in which he stated that the records did not "indicate that the present condition is due to the accident of March 26" and as above stated, he now very definitely states that he can't honestly say whether petitioner's present condition is or is not due to such accident and that he was not saying there could not be some relation between that accident and petitioner's present condition. This, we believe eliminates all conflict between his testimony and that of Doctors Steelman and McCann. In other words, Doctor Moore takes a completely neutral position. He doesn't know and he declines to give an opinion one way or the other.

In answer to the question whether the disabled condition he found in petitioner on September 22 when he first examined him would or would not be related to the accident and injury of March 26, Doctor Steelman had testified that:

"It is quite possible that the whole disease process which he (petitioner) has, that is, the leg pain, the back pain, is one disease. That is, he has evident-

ly had trouble with his back for a number of years. There is evidently a weakness there, and these changes have been going on for some length of time, as evidenced by the formation of spurs in the lumbar spine. That predisposes the disc to rupture and the back to instability, and any type of injury or strain could accentuate this condition and make it worse. That is, the back pain usually precedes the leg pain by a variable period of time, maybe months or maybe weeks, maybe years. Does that answer your question, sir?

"Q. Can you say whether or not in your opinion his disability that you describe would or would not be logically related to the condition he suffered as a result of a strain on March 26th as described by Dr. McCann? A. I think it *could remotely related to it.* (Emphasis supplied.)

"Q. You believe that there is a herniation of the intervertebral disc? A. I do.

"Q. Following rupture? A. I do.

"Q. What would be the ordinary development of such a condition? Assuming, for example, that he might have ruptured a disc March 26th, would the herniation show up right away or would it ordinarily— A. It could show up right away or later on. Probably most of the time the actual leg pain, which is the most obvious manifestation of ruptured intervertebral disc, comes

on sometime after the back pain. That is, the disc is injured in the back causing pain in the spine because of irritation of nerves in the bones and ligaments. Later on, when the nerve root is pressed on, it causes the leg pain, so that the back pain usually precedes the leg pain."

On examination by the referee, Doctor Steelman had the following to say:

"Q. Well, Doctor, is there anything else you would care to state to help the Commission determine whether there is a new and additional disability previously undiscovered as he has alleged? A. I think it should be made clear about whether there was an actual injury in August at the time he was driving a truck. The history as stated here, he noticed that while he was driving a truck for the State Highway Department he had onset of pain in the back radiating to the left hip, posterior aspect of the thigh and leg as far as the heel. Apparently this came on without trauma according to my history. The previous injury in March evidently was a back sprain, and I think it is important to consider that the back pain and leg pain are two manifestations of the same disease, and the Commission then should judge whether or not this condition which he had in his back was aggravated by this injury, and that, of course, is not really a medical opinion, but witnesses testifying that he hurt

his back while on work. Do I make myself clear?

"Q. Yes, with one exception. The witness testified that he noticed considerable additional pain and disability in August when he was lifting and loading sacks of cement into his truck. Would that make any difference in your opinion as to whether or not there was an aggravation or new disability arising out of the prior trauma? A. Certainly it could aggravate a pre-existing weakness there, and if he had a weak disc, the proper amount of trauma or strain applied to the back could make it worse."

Doctor McCann, the family physician, testified that he had known and had taken care of petitioner's family for at least six years and that he filed the report of injury of petitioner showing a low back injury as a result of the accident of March 26. He stated that that was the first time he had treated petitioner for a back ailment or that he had complained of his back. He stated that at the time petitioner made the complaint to him of the pain in the lumbar area there was an acute muscle spasm of the entire lumbar musculature resulting in limited motion, that he gave him a prescription for medicine to ease pain, probably codeine, and taped his back for support and treated him frequently until he released him on March 30. He stated that petitioner came in to his office again in August and his complaint was approximately the same as in March but that he did not have the muscle rigidity that he had in March. The pain was localized on the latter occasion to the 4th and 5th lumbar area. There was no complaint made at the time of the involvement of either leg of either numbness or pain. It was all localized in the lower lumbar area of the 3rd, 4th and 5th lumbar. He stated that in March the entire lumbar area was a rigid mass which on the second occasion was without rigidity but had localized pain. Doctor McCann testified he did not think that he could pin petitioner's complaint in August down to definitely saying that his second injury was due to the first injury; that it was due to his knowledge of the first episode in the same area that he put on his initial report of the second accident of a possible disc, *"because it was involving the same area with the pain syndrome he had without trauma, (in August) or without enough trauma to produce anything else, that made him suspicious of a disc."* (Emphasis supplied.) On the first examination in March he did not suspicion disc difficulty. He was then asked:

"Q. Would you say that possibly this second trouble that he had could have in part or directly or indirectly resulted from the first accident is what I am wondering? A. I would say it would be definitely possible, but I would have no way of saying for sure that it is.

"Q. It would be possible, but you couldn't pin it down definitely? A. No, I couldn't tie it down definitely.

"Q. In your opinion, is it very likely that it was, would you say? *A. I would say that he has all the background for it.* (Emphasis supplied.)

"Q. There is a probability anyway that it does? *A. There is a probability I would say, yes.* (Emphasis supplied.)

"Q. That it does arise from the first accident? A. Yes."

The petitioner testified that his back had not bothered him from 1949 shortly after he went to Oregon until he was injured on March 26, 1953; that his back never did get right after said injury and that it "bothered" him all the way through; that it "bothered" him when he got on heavy lifting or "strained myself just right." He further testified that it seemed to hurt in the same place and that finally in August when he hauled some cement and carried it to the barn that is when his back really began to get him down. He continued to work, however, until September when he was forced to take sick leave although his boss had tried to give him lighter work and he had at all times favored his back while doing such work. This is corroborated by Mr. Cardon who testified to the same effect.

Mr. Cardon testified that he was foreman in charge of the work done by petitioner from October 1952 until September 1953, that between October 1952 and March 26, 1953, petitioner never complained of his back at any time and that he was engaged "in a lot of hard work and heavy lifting" and in driving a truck; that during said time

" * * * we dug ditches and we laid pipe and we was wrecking buildings and we was moving equipment and moving—Just general construction."

He further stated that on March 26 petitioner was loading or helping to load barrels which they were hauling away, and that he slipped and hurt his back. He complained at the time he slipped that he had hurt his back; that he only worked about thirty minutes after that time when he had to stop work because of the pain; that since around April 1st following when he returned to work petitioner was complaining quite a bit. Mr. Cardon said:

"He went ahead and worked, but he was complaining and I kind of helped him out and put him on lighter work."

He stated that he noticed petitioner did favor his back after the injury of March 26.

Mr. Pullins, manager of the Patterson Ginning Company of Peoria, states in his affidavit that petitioner was employed by the Ginning Company from September 1950 through October 3, 1952, as a stand-walker and that during said period his duties involved maintaining ten gin-stands to their full efficiency; that said duties required petitioner to be on his feet at all times and to be mentally alert and to repair any of said

134

machines which became out of order and that petitioner performed his duties in an efficient manner and at no time complained of the manual labor involved or of his back and that he often worked as high as 84 hours per week.

It appears to us that the testimony of Doctors Steelman and McCann plus the historical circumstances prior and subsequent to the accident as related by petitioner in his testimony and corroborated by the testimony of J. A. Cardon, foreman of the State Highway Department hereinabove set forth in substance, and the affidavit of Eddie Pullins, gin manager of the Patterson Ginning Company of Peoria, completely refutes the finding of the commission that there is insufficient medical evidence to indicate that petitioner is suffering any new, additional or previously undiscovered disability attributable to said injury of March 26, 1953.

In the case of Apache Powder Co. v. Bond, 61 Ariz. 184, 145 P.2d 988, 990, wherein it was sought to set aside an award of the commission upon the ground that it was based upon medical testimony which it was claimed was based on surmise, speculation and conjecture. Doctor Causey there testified that it "was a possibility" that there was a causal connection between the disability suffered by the petitioner in that case by reason of aggravation of a pre-existing disease and the accident. Dr. Davison said that "it could be," meaning there could be a causal connection between the disability and the accident. Justice Windes, then a superior court judge, writing the opinion for the court said:

"* * * There is substantial merit to this contention, but we think that the historical circumstances prior and subsequent to the accident, together with the nature of the accident, is sufficient, together with the doctors' testimony of possible causal connection as would give legal validity to the commission's conclusions. A doctor's opinion on matters of this character does not have to be positive in order to have some value as evidence." Citing Ison v. Western Vegetable Distributors, 48 Ariz. 104, 59 P.2d 649, 653, and quoting therefrom as follows:

"'* * * It is urged that the testimony of one physician is positive that the injury caused the abscess, while, the other merely states that it was extremely probable that it did not, and that the commission should, therefore, have accepted the positive testimony over that which was merely conjecture. There might be some merit in this contention if the point at issue was one which was subject to positive knowledge, such as the presence or absence of a certain person, a collision between two automobiles, or other similar matters; but the question is necessarily one of opinion and not of knowledge, and, when this is so, the fact that

one opinion is expressed more positively than the other, does not, as a matter of law, require that a trier of fact give it more weight. We are compelled to hold, therefore, that the conclusion of the commission that it does not appear affirmatively that there was any causal connection between the accident of April 9th and the disability from which petitioner admittedly suffered, must be upheld.' "

Quoting further from Apache Powder Co. v. Bond, supra, the court said:

"We do not wish to be interpreted as here holding that the indefinite expert testimony submitted by these doctors would be sufficient of itself to remove the matter from the realm of speculation, but we do hold that when a workman in apparent good health, with a history indicating a prior tubercular condition, sustains an injury through inhalation of gas of sufficient quantity to cause unconsciousness, resulting in a fractured skull, followed shortly with a severe case of disabling active tuberculosis, and two doctors testify to the possibility of the accident and injury contributing to his existing tubercular condition, the commission may legally award compensation for such ailment."

In the instant case we have the testimony of petitioner corroborated by two different employers extending over a period of approximately three years to the effect that petitioner had been engaged in various kinds of heavy work up until the date of his injury working as much as 84 hours per week at times and required to be on his feet all of the time, who never complained of a back injury of any kind until his injury of March 26, 1953, and that thereafter according to the foreman of the Highway Department by whom petitioner was then employed that although given light work he continuously complained of back injury from March 26 until September following when he was forced to take sick leave because of the suffering resulting therefrom.

■ We held in Ison v. Western Vegetable Distributors, supra [48 Ariz. 104, 59 P.2d 652], and in several civil cases that:

" * * * triers of fact may not disregard the undisputed testimony of witnesses who have no interest in the matter, unless their testimony is unreasonable or impeached by some of the circumstances of the case. [Citing cases.] "

This is true although the trier of fact is not required to accept the uncorroborated testimony of the petitioner. Davis v. Industrial Commission of Arizona, 46 Ariz. 169, 49 P.2d 394.

It is our view that the uncontradicted testimony of Doctors Steelman and McCann as above set forth plus the historical circumstances prior and subsequent to the accident together with the nature of the accident and injury is sufficient to compel the

commission to set aside the award here in question. If we eliminate the opinion of Doctor Moore in his report to the commission on October 28, and we think his testimony on the *rehearing of December 29, 1954*, completely refutes it, there is no evidence upon which to base the award of February 24 denying compensation.

■ We recognize that if petitioner was injured by *accident arising out of and in the course of his employment with the Highway Department at some time subsequent to March 26, 1953*, and that it was from that accident that the ruptured disc resulted, technically petitioner was not entitled to *relief based upon his injury of March 26*, although he would have been entitled to relief had such claim been grounded upon his injury at such subsequent date. Under such circumstances it was certainly the duty of the commission to liberally construe the statute and fairly weigh the evidence to the end that the injured worker would be compensated therefor in accordance with the declared intention of the legislature in enacting the Workmen's Compensation Act. Trett v. McElroy, 70 Ariz. 254, 219 P.2d 337.

We are of the view that there is no conflict in the evidence and that there is no evidence to support the award as made. It is therefore ordered set aside.

STANFORD, LA PRADE, UDALL, and WINDES, JJ., concurring.