436 P.2d 928

Clara F. MEEKS, Widow of Robert L. Meeks, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona and Earl Haun (Earl H. Haun Masonry Contractor), Respondent.

No. I CA-IC 132.

Court of Appeals of Arizona.

Feb. 8, 1968.

Donald J. Morgan, Phoenix, for petitioner.

Robert K. Park, Chief Counsel by Arthur B. Parsons, Phoenix, for respondent Industrial Commission.

DONOFRIO, Judge.

This is a review of an award of The Industrial Commission of Arizona denying a widow's claim for compensation. Clara F. Meeks, the widow of Robert L. Meeks, made the claim on the basis that the industrial dust inhaled by her husband during the activities of his employment was a causal factor in his death from bronchogenic carcinoma.

Mr. Meeks started to work for Earl Haun Masonry Contractor in June of 1961 as a laborer and truck driver. At that time Mr. Haun was doing masonry work and engaged in building houses in a tract of about 240 houses. About half of the houses were built of adobe brick. For the first six months Mr. Meeks' job was to saw adobe bricks to the correct size to be used principally for trim under windows or over doors. In sawing through some of the bricks there would be such things as pieces of iron or hard pieces of rock and other debris. While doing this sawing, Mr. Meeks used an electric masonry saw and wore a respirator. The saw was equipped with a shield which caused the adobe sawdust created to then fall to the saw table. After the six-months' period Mr. Meeks did general labor work and for perhaps 4 hours each week he used the saw to saw pumice block. Sometimes two or three months would go by without any use of the saw. The general labor included scraping down walls and cleaning up after masons who had put up the block walls of the houses. This included shoveling broken brick pieces and dried mortar into a wheelbarrow or truck and trucking it to the dump. This refuse amounted to as much as thirty gallons for a big house. When using the block saw, dust was thrown into the air so as to cover Mr. Meeks' clothing, and also the shoveling work was very dusty and he wore the respirator while doing it. Before Mr. Meeks went to work for Mr. Haun he had sinus trouble and respiratory difficulties.

In November 1964 Mr. Meeks had a slight cold and in December he complained of laryngitis. He then developed a cough, with difficulty in speech and breathing. In February he was admitted to the hospital. Diagnosis of bronchogenic carcinoma was made which after a steady downhill course resulted in his death on June 1, 1965.

**152**

On March 8, 1965 Mr. Meeks filed a claim for benefits under the provisions of the Arizona Occupational Disease Disability Law and on March 23 the Commission entered its award for noncompensable claim. After a petition and application for a hearing was filed, and before other action could be taken, he passed away. Subsequently Mrs. Meeks filed her widow's claim for compensation, and on January 19, 1966 the Commission entered an award denying her claim. Petition and application for hearing was filed after which the Commission affirmed its previous decision, finding that the bronchogenic carcinoma was "neither caused by, precipitated, aggravated, accelerated or in any way adversely affected by the condition of decedent's employment".

The question before us is whether the Commission's finding is reasonably supported by the evidence.

Petitioner's position is that her husband was accidentally exposed to large quantities of dust in his work which caused or aggravated his carcinogenic condition from which he died, and that the Commission cannot in the light of the record refuse to recognize her claim in this regard. It is her contention that this record shows that Dr. Daniel T. Meredith, the family physician, in answer to hypothetical questions, gave positive opinion that breathing of the dusts would be detrimental to and causative of a carcinogenic condition, ruling out smoking as the cause since Mr. Meeks was a non-smoker, whereas the testimony of Dr. Russell M. Maynard, the pathologist upon whom the Commission relies, is negative in character in that he could not attribute etiologically the carcinoma to the dust.

The Commission on the other hand urges that this is a question of causation which can be resolved only by expert medical testimony, taking the position that the medical evidence of Dr. Maynard who is a pathologist and performed the autopsy is of more weight. Dr. Maynard testified that the cancer was not caused or aggravated by the industrial dust. The Commission contends

that Dr. Meredith's testimony is uncertain in nature and that the award is reasonably supported by the evidence.

At the outset we set forth a few excerpts from the medical testimony of Dr. Meredith to better understand the questions involved.

"Q Now have you made or formed any opinion or conclusion as to the probable onset or aggravation of this lung condition?

"A Yes, I discussed it with him and and his wife several times, trying to find what could have been the basic cause of this. He is a non-smoker. Usually, we think of that with bronchogenic carcinoma. Of course, any irritating factors can be the etiological factor in something like this. He stressed this many times, everytime I talked to him about it, this dust he inhaled at his work. I formed the opinion, my own opinion, that possibly that could have been the factor, since I had known him for many years and he has always been such a hardworking, fairly healthy individual. I felt that the dust, the ingredients of this, would be irritating enough to cause this growth to start in his lungs.

\*     \*     \*     \*     \*     \*

"A Well, the question is do I feel in this type of dust that he was exposed to it would be detrimental and a causative factor in producing a carcinogenic condition? I think it would, breathing especially adobe. I don't know what all adobes do contain.

"Q I can give you the fact that the adobe he was working with contained dirt from Mexico, and so on.

"THE REFEREE: Do I understand you don't know what they contained, if you are saying that they can cause it?

"A Well, yes, I don't know what all is in adobe, but I know it is dirt and mud and grass and everything all mashed up together, and they make these blocks out of it. Certainly there is no sterilization done there. So I think it could be bac-

terial and mechanical damage to the lungs from this."

As opposed to the opinion expressed by Dr. Meredith we set forth the following excerpts from the evidence of Dr. Maynard who was the pathologist at the Veterans Hospital where Mr. Meeks died. Dr. Maynard also performed the autopsy. His report stated:

"It is my opinion that there is absolutely no relationship between the bronchogenic carcinoma and exposure to industrial dusts".

The following are excerpts from his testimony:

"A No. In fact, when I received this subpoena, I grabbed all the other material I had and made additional sections, looking for particular matter. I examined it under Fuller microscopy, and *I can say dogmatically that there is no evidence of silica.* That is final. There is no evidence of pulmonary fibrosis reactive elsewhere in the lung, which usually we associate with dust, whether there is silica or otherwise produced. (Emphasis supplied.)

\*     \*     \*     \*     \*     \*

"A My findings were fundamentally a bronchogenic carcinoma of the left lung with extensive invasions of the pleura, mediastinum, and pericardium by tumor; mestastases to lymph nodes, liver, and right adrenal; there was wasting of the body which we see in these cancer cases; there was a pleural effusion, in other words, a release of fluid into the pleural space, which was related to the carcinoma invading the pleura. There was some necrotizing bronchopneumonia.

\*     \*     \*     \*     \*     \*

"A It was a secondary bifurcation of the bronchus, with ingrowth of the material into the lumen. Now, inspection of the tumor microscopically proved it to be of the type that we frequently see originating in this location. It was not forming mucous to any great extent. Some bronchogenics form mucous, some

do not. We have a histologic variation in the development of these tumors.

\*     \*     \*     \*     \*     \*

"MR. MORGAN: Q The real question counsel was asking, he is not concerned particularly with the etiology of the production of bronchogenic cancer, but he asks and I believe this is the question I would like to know what you think about; you were here when Dr. Meredith was questioned and certain facts were given, you have heard the testimony of Mrs. Meeks as to his non-smoking for twenty-seven years, and fairly light before that; the question I want to ask is, is it probable or reasonable that this exposure to dust, as was testified, would relate to the development or rate of development of a carcinoma?

"A I don't believe so, no. In my opinion, not. In statistical analysis, in other words, in reviewing the case reports of bronchogenic carcinoma—and I looked for them when I found out I was coming —I found none of the literature that indicated that dust exposure, per se, was specifically related to carcinoma of the lungs."

■ Readily we see that we have two duly qualified and reputable physicians rendering conflicting opinions on the question of causation. It is incumbent on the Commission as trier of fact to determine which one is more probably correct. In doing so it may take into consideration the experience and background of each of the witnesses. Ison v. Western Vegetable Distributors, 48 Ariz. 104, 59 P.2d 649 (1936).

■ The Commission is trier of facts and the evidence adduced before it will be considered in the light most favorable for sustaining its award. Everett v. Industrial Commission, 3 Ariz.App. 145, 412 P.2d 487 (1966).

Dr. Meredith testified that he knew Dr. Maynard whose specialty was pathology and that "on these matters of carcinoma" he would be inclined to defer to Dr. Maynard's opinion with respect to them. In

answer to questions regarding Dr. Maynard's pathological opinion, Dr. Meredith testified:

"A *Well, in his field of pathology and tissues and studying them, he knows them all.*

"Q *Including causation and such things as that, sir?*

"A *Sure, he would be real good. The other etiological factors also.*" (Emphasis supplied.)

A pathologist is defined by Dr. Maynard as follows:

"A A pathologist is fundamentally the scientist with an M.D. degree who specializes in the causation of disease.

"In anatomic pathology, it is the part pertaining to the diagnosis of surgical specimens removed by the surgeon and examination of tissues at autopsy.

"In clinical pathology, it is the study of the body fluids removed from the individual and sent to the laboratory, and supervision of medical technologists in bacteriology, serology, hematology, and chemistry, as well as lesser phases of medical technology."

■■ This is a case that can be resolved only by medical testimony. Revles v. Industrial Commission of Arizona, 88 Ariz. 67, 352 P.2d 759 (1960). Both doctors were permitted to express their opinions. A general practitioner because of his education may know more about the causes of lung cancer than a layman, and a specialist-pathologist because of his additional education may know more about such things than a general practitioner. In this case it can be noted that Dr. Meredith, although positive in the respect that he related the dust to the cancer, was not so emphatic when he formed his opinion as to the relationship between the inhalation of dust and the cancerous condition. At one point his testimony reads, "I formed the opinion, my own opinion, that *possibly* that *could* have been the factor". At another point it reads, "I think it would, *breathing especially adobe. I don't know what all adobes do contain*".

(Emphasis ours.) Under the evidence the Commission could well find that the testimony of the pathologist was of greater weight and more probably correct. Ison, supra. See also Chalmers v. Department of Labor and Industries, Wash., 434 P.2d 720 (1967).

■ Petitioner's position is that the Commission cannot disregard the medical opinion of Dr. Meredith and favor that of Dr. Maynard which is more in the negative sphere. We are unable to agree. Dr. Maynard, as we have noted, was qualified to testify, as was Dr. Meredith, and the fact that one opinion was expressed more positively than the other does not require, as a matter of law, the trier of fact to give it more weight. Udall in Arizona Law of Evidence points out in Sec. 112 that the positive negative evidence rule has no application in cases involving expert medical opinion.

In Ison v. Western Vegetable Distributors, supra, the Supreme Court said:

"It is urged that the testimony of one physician is *positive* that the injury caused the abscess, while the other merely states that it was *extremely probable that it did not*, and that the commission should, therefore, have accepted the positive testimony over that which was merely conjecture. *There might be some merit in this contention if the point at issue was one which was subject to positive knowledge, such as the presence or absence of a certain person, a collision between two automobiles,* or other similar matters; but the question is necessarily one of opinion and not of knowledge, and, when this is so, the fact that one opinion is expressed more positively than the other, does not, as a matter of law, require that a trier of fact give it more weight. We are compelled to hold, therefore, that the conclusion of the commission that it does not appear affirmatively that there was any causal connection between the accident of April 9th and the disability from which petitioner admittedly suffered,

must be upheld." 48 Ariz. 112, 59 P.2d 653. (Emphasis supplied.)

We would hold that the Commission was justified in holding the petitioner failed to sustain her burden of showing Mr. Meeks' lung cancer resulted from his exposure to large quantities of dust in the scope and course of his employment. The award was based principally on the opinion of Dr. Maynard who was well qualified with twenty years' experience as a practicing pathologist, doing multiple bronchogenic carcinoma autopsies.

Award affirmed.

CAMERON, C. J., and STEVENS, J., concur.